1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FIDEL RIOS SOTO,

         Petitioner,

    v.

THERESA CISNEROS, Acting Warden,

         Respondent.

Case No. 20-cv-01115-JST (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

      Before the Court is the *pro se* petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by petitioner Fidel Rios Soto challenging the validity of a judgment obtained against him in state court. Respondent has filed an answer to the petition. ECF No. 14. Although petitioner was given the opportunity to do so, he has not filed a traverse, and the time frame for doing so has passed. For the reasons set forth below, the Court will deny the petition.[1]

**I.     PROCEDURAL HISTORY**

      On September 9, 1997, the Monterey County District Attorney filed an information charging petitioner with murder (Cal. Penal Code § 187) and use of a firearm in commission of felony (Cal. Penal Code § 12022.5(a)). Answer, Ex. A, Volume 1 of Clerk's Transcript ("1 CT") 1-2.[2]

      More than sixteen years later, on March 27, 2013, petitioner was arraigned following an

---

[1] Petitioner previously named Stuart Sherman, the former warden of the California Substance Abuse Treatment Facility ("CSATF"), as the respondent in this action. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Theresa Cisneros, the current acting warden of CSATF, is hereby SUBSTITUTED as respondent in place of petitioner's prior custodian. *See* Fed. R. Civ. P. 25(d).

[2] All exhibit references herein are to the exhibits submitted by respondent in support of the answer, unless otherwise indicated.

1   arrest on the warrant for the aforementioned charges.  1 CT 3.

2       On November 12, 2014, the jury found petitioner guilty of first degree murder with an

3   enhancement for use of a firearm.  1 CT 201-202.  On June 4, 2015, the trial court sentenced

4   petitioner to thirty-five years to life in prison with the possibility of parole.  1 CT 261.

5       Petitioner appealed and, on June 13, 2018, the California Court of Appeal affirmed his

6   conviction.  *People v. Soto*, No. H042397, 2018 WL 2949484 (Cal. Ct. App. June 13, 2018).  The

7   California Supreme Court denied review on September 26, 2018.  Answer, Ex. H.  On February

8   25, 2019, the United States Supreme Court denied his petition for a writ of certiorari.  ECF No. 1

9   at 274[3] (Pet., Ex. F).  Petitioner did not seek habeas review in the state courts.  On February 12,

10  2020, petitioner filed the instant federal petition for a writ of habeas corpus.  ECF No. 1.

## II.   STATEMENT OF FACTS

12      The following background facts are taken from the June 13, 2018 opinion of the California

13  Court of Appeal:[4]

> Hilario Avila was fatally shot on August 30, 1997, in the Greenfield
> apartment where he lived with three other people.  One of his
> cotenants, Emidio Cruz, testified that he saw the shooting.  He said
> that he and the victim had been living in the apartment's living room,
> while defendant—whom he knew as Julio—shared the apartment's
> single bedroom with Consuelo Garcia Rodriguez, also known as
> Chelo, whom defendant later told police was a sometime prostitute.
> Cruz identified defendant (as "Julio"), both in court and in a 17-year-
> old photograph.
>
> According to Cruz, the three men had been drinking beer since around
> 3:00 p.m., when they had arrived home from their day's work for an
> agricultural labor contractor.  They were joined by Francisco Lopez,
> also known as Don or Dominguez Pancho or Panchito, a friend of
> Cruz's.  Immediately before the shooting, Cruz was standing in a
> corner of the living room talking to Panchito.  Hilario Avila, the
> victim, was sitting in a chair when defendant emerged from the
> bedroom carrying a lever-action rifle.  Saying, "Ahora si, Hilario"

[3] Page number citations for the parties' filings refer to those assigned by the Court's electronic filing system and are located at the top right-hand corner of each page.

[4] The Court has independently reviewed the record as required by AEDPA.  *Nasby v. McDaniel*, 853 F.3d 1049, 1055 (9th Cir. 2017).  Based on its independent review, the Court finds that it can reasonably conclude that the state appellate court's summary of facts is supported by the record and that this summary is therefore entitled to a presumption of correctness, *Taylor v. Maddox*, 366 F.3d 992, 999-1000 (9th Cir. 2004), *abrogated on other grounds*, *Murray v. Schriro*, 745 F.3d 984, 1000 (9th Cir. 2014), unless otherwise indicated in this order.

United States District Court
Northern District of California

United States District Court
Northern District of California

("That's it, Hilario"), defendant fired three rounds into Avila. He then dropped the rifle and left the apartment.

Pedro Dominguez, a foreman for the farm labor contractor that employed the men, testified that defendant had worked under the name of Julio Moreno and was also known by the nickname "Guero" or "the Guero." Dominguez testified that one night in August 1997 he was outside the front of his home, having just returned home with his family from dinner, when he heard his wife scream from the rear of the house. Upon going to investigate he encountered defendant, who seemed "a little disoriented, but also at the same time, a little upset and, I felt, a little bit out of control." Dominguez "told him to calm down" and asked if something had happened, and what was going on. Defendant asked for a ride.

Dominguez consented in order to get defendant away from the family. As he drove away from the house defendant, who was carrying nothing but the clothes he was wearing, said he wanted to go to Fresno or to Santa Maria in Southern California. Refusing to drive to those distant places, Dominguez dropped defendant at a corner store in Greenfield. His only other interaction with defendant in the ensuing 17 years was a phone call from defendant seeking his final paycheck.

On the night of the killing, police arrived at the scene followed by investigators from the district attorney's office. Avila was still sitting in the chair, dead. He proved to have a blood alcohol content of 0.17 percent. Any of his three gunshot wounds could have been lethal; one bullet had pierced his heart and severed his spine. Lying just inside the front door was a .44-caliber lever-action rifle with the action open. Also on the floor were three spent cartridges and one unspent cartridge. Another unspent cartridge was still in the rifle. Forty-one empty beer cans were found in the apartment.

No fingerprints were found on the rifle. In a bedroom closet, officers found both men's and women's clothing. They also found pill bottles bearing the name of Fidel Rios, as well as various other items in the name of either Julio Moreno or Fidel Rios Soto, including a checkbook holder and a pay stub. Also in evidence was a tenant application dated May 21, 1997, for the apartment where the shooting took place. It identified the tenant-applicant as Fidel Rios Soto and bore his apparent signature as well as that of Consuelo Garcia. The application listed Emidio Cruz as a "relative[ ]."

Outside the apartment, Officer Miguel Cabrera took a statement from Cruz, whom he described as excited, "almost in shock," and "traumatized." Cruz told Cabrera that "Julio" was the killer. Authorities linked this identification to defendant, whom they had previously encountered in connection with an attempted murder-suicide that occurred on April 12, 1997, some four months prior to the Avila killing. Defendant was not a suspect in that matter, but had been photographed and fingerprinted as a witness. Based on their inquiries into the Avila killing, authorities issued a nationwide "be on the lookout" alert for defendant.

Pedro Dominguez's brother, Nazario Dominguez, testified that he was the owner of the labor contracting business for which Pedro was

3

the foreman.  He recognized a photo of the worker known as Julio Moreno or Guero.  He identified a paycheck, with attached stub, dated September 5, 1997, and made out to Julio Moreno.  It covered a pay period from August 24, 1997 to August 30, 1997.  The stub, which was admitted without objection or limitation, appears to show that defendant worked six hours on August 30, 1997, the date of the killing.  It was never picked up by, or delivered to, defendant.

The prosecutor filed a complaint on September 10, 1997, charging defendant with murder (Pen. Code, § 187) and alleging a sentence enhancement for personal use of a firearm (Pen. Code, § 12022.5, subd. (a)).  After police failed to locate defendant, the case "went into the dead file" until March 2013, when defendant was detained by the California Highway Patrol near Willits in Glenn County.  His fingerprints matched those of the Monterey County suspect.  A deputy sheriff and an investigator from the district attorney's office drove to Glenn County to retrieve him.

On March 26, 2013, defendant was questioned by investigators from the district attorney's office under circumstances described more fully [below].  His statements were offered at trial as misleading or evasive, and thus indicative of consciousness of guilt.  He admitted to the investigators that he had used the name "Julio" and had possessed a lever-action rifle, though he said he had it only briefly.  At their request he made a drawing, which was placed in evidence, resembling the murder weapon.

After defendant's apprehension, authorities tried unsuccessfully to locate Consuelo Garcia Rodriguez ("Chelo") and Francisco Lopez ("Don Panchito"), both of whom had been questioned in 1997. Neither could be found.

*People v. Soto*, 2018 WL 2949484, at *1-2 (brackets in original and brackets in "[below]" added).

## III.    DISCUSSION

### A.    Standard of Review

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Penry v. Johnson*, 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams*, 529 U.S. at 405-06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). This presumption is not altered by the fact that the finding was made by a state court of appeals, rather than by a state trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082, 1087 (9th Cir.), *amended*, 253 F.3d 1150 (9th Cir. 2001). A petitioner must present clear and convincing evidence to overcome section 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. *Id.* Under 28 U.S.C. 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions

United States District Court
Northern District of California

5

as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003).

In applying the above standards on habeas review, the Courts in this Circuit look to the decision of the highest state court to address the merits of the petitioner's claim in a reasoned decision. *See Wilson v. Sellers*, __ U.S. __, 138 S. Ct. 1188, 1192 (2018); *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). When there is no reasoned opinion from the highest state court to consider the petitioner's claims, the Court looks to the last reasoned opinion. *Ylst v. Nunnemaker*, 501 U.S. 797, 801-06 (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). Thus, a federal court will "look through" the unexplained orders of the state courts rejecting a petitioner's claims and analyze whether the last reasoned opinion of the state court unreasonably applied Supreme Court precedent. *See Ylst*, 501 U.S. at 804-06; *LaJoie*, 217 F.3d at 669 n.7. The California Court of Appeal was the highest state court to have reviewed petitioner's claims in a reasoned decision, and it is the state appellate court's decision that this Court reviews here. *See Ylst*, 501 U.S. at 803-04; *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

### B. Petitioner's Claims

Petitioner asserts the following six grounds for federal habeas relief: (1) the trial court erroneously admitted statements made during petitioner's custodial interrogation that were elicited by District Attorney ("D.A.") investigators, in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981); (2) trial counsel provided ineffective assistance ("IAC") based on their failure to file a motion to suppress the statements made by petitioner during his custodial interrogation under *Massiah v. United States*, 377 U.S. 201 (1964); (3) petitioner's rights under the Confrontation Clause were violated when the trial court allowed a prosecution witness to allude to statements by non-testifying witnesses that placed defendant at the scene of the shooting; (4) trial counsel provided ineffective assistance ("IAC") by failing to request curative instructions regarding the admission of the statements of the non-testifying witnesses; (5) the prosecutor committed misconduct by eliciting the testimony from the prosecution witness that alluded to the statements

6

1   of the non-testifying witnesses in violation of *Crawford v Washington*, 541 U.S. 36 (2004); and

2   (6) cumulative error.  ECF No. 1 at 5-7.  The Court addresses these claims in turn.

3                   **1.      Admission of Statements From Custodial Interrogation**

4          Petitioner, whose first language is Spanish,[5] argues that the admission at trial of the

5   custodial interrogation of petitioner by the D.A. investigators violated *Edwards*, which precludes

6   any further communication with a defendant once counsel is requested.  ECF No. 1 at 5; ECF No.

7   1-1 at 136.  He further argues that his waiver of the right to counsel, if one occurred, was not

8   knowing and voluntary.  *Id.*  Petitioner asserts that these violations compel exclusion of his

9   subsequent post-*Miranda*[6] statements.  *Id.*

10                  **a.      State Court Opinion**

11         The state appellate court summarized this claim and denied it on the merits as follows:

12         **A. Background**

13         Defendant was arrested in Glenn County in March 2013.  On March
           26, he was brought to Monterey County and interviewed by Monterey
14         County District Attorney Investigators Antonio Rodriguez and
           Maribel Torres.  Investigator Torres said she was present primarily to
15         assist with translation, as the interview was conducted largely in
           Spanish.  In ruling on the motion to exclude the resulting statements,
16         the trial court reviewed both an audio recording of the interview and
           transcripts provided by the defense and prosecution.[FN 1]
17
                  FN 1: In its oral ruling the trial court cited only the prosecution
18                transcript, but we have relied primarily upon the defense
                  version for a number of reasons.  First, since it was proffered
19                by the defense, defendant cannot object to its consideration by
                  the court.  Second, it appears to be complete, whereas the
20                prosecution version ends shortly after defendant signs a
                  written waiver, which was about an hour before the interview
21                ended.  Third, it appears that the prosecutor used the defense
                  transcript in questioning Investigator Rodriguez about the
22                interview.  Further, while defendant notes the presence of
                  some discrepancies between the two transcripts, he
23                identifies—and we have found—none of any consequence.
                  As reflected below, however, we have replaced one garbled
24                portion of the defense transcript with the corresponding text
                  from the prosecution transcript.
25
           In the interview as transcribed, immediately after the investigators
26         introduced themselves and discussed defendant's language

27   ───────────────────────────────
     [5] During the interview, petitioner, a Mexican national, admitted that he spoke English, but his first
28   language was Spanish.  *See* ECF No. 15-1 at 106; ECF No. 1 at 65 (Pet., Ex. B [Pet. for Review]).
     [6] *Miranda v. Arizona*, 384 U.S. 436 (1966).

United States District Court
Northern District of California

preference and place of origin, defendant said that "where [he] was before"—i.e., Glenn County—"they don't let anyone get on the telephone." As a result he had been unable to call his mother, who was "used to my calling her every three or two days." Investigator Torres told him that he would be permitted to call "as soon as you finish with investigator Rodriguez." Defendant indicated that he had a further problem: "[T]he phone numbers I use, I don't remember a single one, they're in my cell phone, with my things. Is there a cell phone amongst my things?" Investigator Torres replied that there was not, whereupon defendant said, "Why? Why, are they all like that? Yesterday, in that place, they took my money, they took the cell phone. They didn't let me speak with anyone, uh, they locked me up, they put me in a room with nobody else, they had me locked up for 23 hours and they only let me out to bathe and, well, I said to myself, well, ok, I'm a brother of the law, and what the law does, right? But if they would give me a chance to speak to my parents and say, 'Hey, you know what? I got arrested and [—]'"[FN 2]

> FN 2: Here and at many other points in the transcript, the transcriber has used a series of three or four periods to signify a pause by the speaker or an interruption by another speaker. To avoid confusion with our own use of ellipses, we will substitute a bracketed dash ([—]) where such punctuation appears in a quoted passage of the transcript.

The investigators promised to look into the whereabouts of the phone, at which point defendant referred again to the money he had been carrying: "I've been working the last three years, there in Seattle, Washington, I worked full-time with a company and part-time in a restaurant, and I got some money together and I [—]" Investigator Torres interrupted to say, "[B]efore we keep speaking . . . we need to read a warning that, by law, we have to read." She then read defendant his *Miranda* rights in Spanish. (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).) Upon concluding she asked, "OK, 'Having these rights in mind, do you wish to speak with us?'" The following exchange ensued:

"SOTO: I would like to have an attorney, because you're accusing me of something that I did not do. [¶] [TORRES]: Ok, so they already told you [—] [¶] SOTO: Yeah, they already told me that, that [—] when they arrested me they told me it was because of homicide. [¶] [TORRES]: OK, so they notified you? [¶] SOTO: They told me over there, when the police, even [—]" "[TORRES]: Let me see the paperwork. [¶] RODRIGUEZ: You want what?[FN 3]" "[TORRES]: Let's see, the papers? It's that I don't have any paperwork. They arrested you in Glenn County. [¶] [TORRES]: Glenn County? [¶] RODRIGUEZ: Yeah, he's already been notified. [¶] [TORRES]: Ok, that's what he's telling me. [¶] RODRIGUEZ: Yeah, and there's the warrant that they gave him. [¶] [TORRES]: Ok, so, they gave you a copy of your arrest warrant. Ok? That's what I'm looking at, the papers they gave you. [¶] SOTO: Yeah. [¶] [TORRES]: All this came with you. OK, so they are already explained to you why you're here. You know why. Umm, is that all? [¶] RODRIGUEZ: Si. [¶] [TORRES]: It says nothing about phone or anything. [¶] RODRIGUEZ: No. [¶] [TORRES]: Ok. [¶] RODRIGUEZ: Well, there's a phone listed here along with the

money, but I didn't see any phone along with his property. [¶] SOTO: I had almost twenty-three-thousand dollars in cash. [¶] [TORRES]: Ok. [¶] SOTO: There, when I was arrested, they said to me, 'Murder'. Can you clearly explain to me what's happened or why [—]? [¶] [TORRES]: OK, but, that's why I read you your rights, if you wanted to speak with me or not. So, you have that right at the momento [*sic*], if you want to keep speaking, however you wish and I can answer your questions, but having in mind your rights. Do you want to speak with me or not? [¶] SOTO: Yes. [¶] [TORRES]: Yes? [¶] SOTO: Yes."

> FN 3: We have inserted this and the preceding line from the prosecutor's transcript because this portion of the defense transcript is garbled beyond comprehension.

Investigator Torres then again reminded defendant of the rights she had just explained to him and handed him a written waiver form, also enumerating them in Spanish, after he confirmed that he could read in that language. He marked "Yes" in response to the questions, "Do you understand each of these rights that I have just explained to you?" and "Having these rights in mind, do you now wish to speak with us?" He signed and dated the waiver form.

The investigators then questioned him, eliciting admissions about ownership of a lever-action rifle, vague responses to questions about when and where he had lived in Greenfield, and repeated claims that he had left Greenfield in reaction to the attempted murder-suicide that occurred four months before the Avila shooting. After nearly an hour of questioning defendant once again expressed a desire for an attorney. These and other incriminating statements were introduced at trial through the testimony of Investigator Rodriguez.

## B. Proceedings

Defendant moved in limine to exclude his statements to the investigators on the ground that they were elicited in violation of *Edwards v. Arizona* (1981) 451 U.S. 477, 482 (*Edwards*), which held that once an accused invokes his or her right to counsel pursuant to *Miranda*, "the interrogation must cease until an attorney is present." Defendant contended that Investigators Torres and Rodriguez "neither acknowledged his request for counsel, nor stopped the interrogation." Instead, he asserts, they "immediately resumed and redirected the conversation, with several additional statements or questions about what the police had told Mr. Soto earlier, about paperwork, an arrest warrant, prior notifications, a phone, and phone numbers . . . . The investigator then returned to the topic of 'your rights,' . . . and continued the interview. At no time was there a break in custody." The prosecutor replied that the investigators' comments after defendant invoked his rights did not amount to interrogation, and that defendant himself had "reinitiated the interview."

The trial court ruled that the statements were admissible. It explained that, having listened to the audio recording while following in the transcript, it found defendant had unambiguously invoked his right to counsel. It also found, however, that the conversation following that

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

invocation was not an interrogation.  "The statements were innocuous in that Mr. Soto had asked about his phone, and I believe the officers were trying to determine whether the phone was in the custody of the agency where he was originally arrested . . . ."  The conversation concerned where he was arrested, as well as "some talk about paperwork and his phone . . . .  And then Mr. Soto says at some point right after that, 'When they arrested me, they said it was for murder.  If you can explain to me clearly what happened.  Why?'" After which, the court noted, he was reminded of his rights, which he voluntarily waived.  Accordingly, said the court, "I don't find that there is any interrogation that occurred between the time he invoked his right to counsel and when he re-initiated a willingness to talk to the attorneys [*sic*]."  Specifically, the court said, "I don't find that the officers' subsequent statements to the defendant called for an incriminating response."

At trial, Investigator Rodriguez was questioned at length about defendant's statements, many of which were offered as misleading or evasive, and thus indicative of consciousness of guilt.  Defendant also admitted his use of the name "Julio" as well as his possession of a lever-action rifle, of which he made a drawing, resembling the murder weapon.  The prosecutor also emphasized a point in the interview at which defendant suggested he had used the rifle for hunting.  When asked whether he had killed anything, defendant laughed— illustrating, as the prosecutor argued, "the mind of a murderer."

**C.** *Edwards* **Error**

**1. Standard of Review**

In *Edwards*, *supra*, 451 U.S. at pages 484-485, the court held that "an accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities . . . unless the accused himself initiates further communication, exchanges, or conversations with the police." An *Edwards* violation therefore occurs when (1) the accused invokes the right to counsel; (2) officials thereafter continue or resume interrogation; and (3) the accused has not initiated the further interrogation.  In determining whether these factors are present, "the scope of our review is well established.  'We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported.  [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained.'"  (*People v. Bradford* (1997) 14 Cal. 4th 1005, 1033 (*Bradford*).)  "We review the trial court's finding regarding whether interrogation occurred for substantial evidence or clear error." (*People v. Clark* (1993) 5 Cal.4th 950, 985, disapproved on a different point in *People v. Doolin* (2009) 45 Cal. 4th 390, 421, fn. 22.)  However, since the trial court's findings in this case were based entirely on the undisputed audio recordings of the investigators' interviews with defendant, there are no disputed facts, and we exercise independent review.  (*People v. Maury* (2003) 30 Cal.4th 342, 404; *People v. Vasila* (1995) 38 Cal. App. 4th 865, 873.)

### 2. Invocation

The trial court found that after he was advised of his *Miranda* rights, defendant "unambiguously invoked his right to an attorney." The point was not disputed below, and is not disputed here. We therefore deem the first element of an *Edwards* violation to be established.

### 3. Interrogation

Defendant contends that the continued conversation between and among the investigators and defendant following defendant's invocation of the right to counsel amounted to continued interrogation in violation of *Edwards*. This contention must be assessed in light of the prophylactic purposes of the *Miranda* and *Edwards* rules. (See *Maryland v. Shatzer* (2010) 559 U.S. 98, 105 (*Shatzer*) [rules do not reflect "a constitutional mandate, but judicially prescribed prophylaxis"]; *Edwards*, *supra*, 451 U.S. at p. 492 (conc. opn. of Powell, J.) [referring to "prophylactic rule" of *Miranda*].) Their function is to "protect a suspect's Fifth Amendment right from the 'inherently compelling pressures' of custodial interrogation." (*Shatzer*, at p. 103.) "The rationale of *Edwards* is that once a suspect indicates that 'he is not capable of undergoing [custodial] questioning without advice of counsel,' 'any subsequent waiver that has come at the authorities' behest, and not at the suspect's own instigation, is itself the product of the "inherently compelling pressures" and not the purely voluntary choice of the suspect.' . . . The *Edwards* presumption of involuntariness ensures that police will not take advantage of the mounting coercive pressures of 'prolonged police custody,' [citation], by repeatedly attempting to question a suspect who previously requested counsel until the suspect is 'badgered into submission,' [citation]." (*Shatzer*, at pp. 104-105.)

In *Rhode Island v. Innis* (1980) 446 U.S. 291 (*Innis*), the court adopted a definition of "interrogation" carefully tailored to this prophylactic purpose. That case holds that police conduct can trigger the rule of *Edwards* even if it does not consist of purely interrogative statements: "To limit the ambit of *Miranda* to express questioning would 'place a premium on the ingenuity of the police to devise methods of indirect interrogation, rather than to implement the plain mandate of *Miranda*.'" (*Innis*, at p. 299, fn. 3.) The court therefore defined "interrogation" as "words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Innis*, at p. 301, fn. omitted.) Consistent with this definition, "'[n]ot all conversation between an officer and a suspect constitutes interrogation. The police may speak to a suspect in custody as long as the speech would not reasonably be construed as calling for an incriminating response.'" (*People v. Hensley* (2014) 59 Cal.4th 788, 810-811, quoting *People v. Clark*, *supra*, 5 Cal. 4th at p. 985.)

Under *Innis*, a suspect's invocation of the right to counsel does not require officers to desist from all attempts to communicate with the accused, but only that they refrain from "words or actions" that are "reasonably likely to elicit an incriminating response from the suspect." (*Innis*, *supra*, 446 U.S. at p. 301, fn. omitted.) Defendant

seeks to undermine this limitation on the *Edwards* doctrine by citing dicta to the effect that "*all* questioning must cease" once the right to counsel is invoked. (*Smith v. Illinois* (1984) 469 U.S. 91, 98 (*Smith*); see, e.g., *People v. Nguyen* (2015) 61 Cal. 4th 1015, 1077 (*Nguyen*) [noting officers' duty to "cease questioning" upon invocation]; *In re Art T.* (2015) 234 Cal. App. 4th 335, 356 (*Art T.*) ["all questioning should have ceased" once minor requested counsel].) But these cases cannot be understood to modify *Innis*'s definition of interrogation, for three reasons: (1) None of the cited cases purports to define interrogation; (2) the definition defendant extracts from them does not conform to the purpose of the *Edwards* rule; and (3) defendant's approach is incompatible with the so-called "booking exception" to the *Edwards* rule.

None of the cases cited by defendant on this subject presented an issue of whether the police conduct at issue constituted interrogation. (See *Art T.*, *supra*, 234 Cal. App. 4th at p. 356 [question was whether a 13-year-old suspect successfully invoked his right to counsel when, upon being shown video of a shooting, he said, "'Could I have an attorney? Because that's not me.'"]; *Smith*, *supra*, 469 U.S. at p. 95 [whether defendant's request for an attorney was too ambiguous to effect an invocation of the right to counsel in view of subsequent remarks; "threshold inquiry" was whether he had effectively "invoked his right to counsel in the first instance"]; *Nguyen*, *supra*, 61 Cal. 4th at pp. 1076, 1077 [whether defendant's statements admissible for impeachment where detective "deliberately flouted *Miranda* and *Edwards*" (*id.* at p. 1077) by "continu[ing] the interrogation" after invocation of the right to counsel; whether detective's conduct reflected a departmental practice of "'widespread, systematic police misconduct'" such as might warrant a distinct exclusionary rule]; *People v. Stitely* (2005) 35 Cal. 4th 514, 533-536 [whether defendant unambiguously invoked right to silence by saying "'I think it's about time for me to stop talking,'" where detective reaffirmed his right to do so but defendant continued talking about case]; *People v. Peevy* (1998) 17 Cal. 4th 1184, 1188, italics omitted [whether rule admitting un-*Mirandized* statements to impeach testifying defendant applies "when a police officer conducting a custodial interrogation deliberately fails to honor a suspect's request for counsel, with the objective of securing evidence for impeachment purposes"]; *People v. Boyer* (1989) 48 Cal. 3d 247, 274 (*Boyer*) [whether *Edwards* was violated when, after invocation of right to counsel, investigator "launched into a monologue on the status of the investigation," asserted that defendant's claims on a critical point were disputed by a witness, and warned that defendant was still under investigation, with result that defendant's "will buckled" and he "blurted, 'I did it.'"], disapproved on another point in *People v. Stansbury* (1995) 9 Cal. 4th 824, 830, fn. 1; *Minnick v. Mississippi* (1990) 498 U.S. 146, 147 [whether defendant who consulted attorney after invoking right to silence could thereafter be interrogated without regard to *Edwards*]; *Anderson v. Terhune* (9th Cir. 2008) 516 F.3d 781, 785 [whether *Edwards* violated where, "[d]espite clear and repeated invocations of his right to remain silent, the officer continued to question Anderson about the murder"]; *Garcia v. Long* (9th Cir. 2015) 808 F.3d 771, 773, [same; defendant confessed when questioning continued after unequivocal invocation of right to silence]; *United States v. Hunter* (7th Cir. 2013)

708 F.3d 938, 947 [whether invocation was ambiguous where defendant, while being treated for gunshot wounds, asked officer to "'call my attorney'"; instead two officers entered room and "began interrogating him"].).

Because none of these cases addressed an issue like the one before us, the language defendant extracts from them cannot control the result here. "'"It is axiomatic that language in a judicial opinion is to be understood in accordance with the facts and issues before the court. An opinion is not authority for propositions not considered."' [Citations.] 'An appellate decision is not authority for everything said in the court's opinion but only "for the points actually involved and actually decided."' [Citation.]" (*People v. Knoller* (2007) 41 Cal.4th 139, 154-155.) In view of this principle, none of the cited decisions supports the proposition on which defendant's argument implicitly rests, which is that *any* kind of "questioning" after an invocation of the right to counsel violates *Edwards*.

A more likely explanation for the language cited by defendant is that the courts in the above cases were using the term "questioning" as simply an alternative, shortened label for "custodial interrogation." The Supreme Court in *Innis* used the terms interchangeably, defining both, for present purposes, as "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." (*Innis*, *supra*, 446 U.S. at p. 301; see *id.* at p. 302 [officers did not engage in "the 'functional equivalent' of questioning" where no evidence they should have known their conversation "was reasonably likely to elicit an incriminating response"]; *People v. Celestine* (1992) 9 Cal. App. 4th 1370, 1373, 1374 [using phrase "functional equivalent of questioning" as shorthand for *Innis* test].)

Further, defendant's delineation of the offending conduct would subvert, rather than serve, the purposes of the *Miranda* and *Edwards* rules. To prohibit all police "questioning" of any kind would be overinclusive because it would preclude inquiries having no apparent tendency to elicit an incriminating response. It would contradict existing authority by barring from evidence a voluntary admission given in response to an entirely innocent query. (See, e.g., *Bradford*, *supra*, 14 Cal. 4th at p. 1034 [detective incidentally in area of defendant's booking did not engage in custodial interrogation by observing that defendant "looked 'like a traffic ticket'" and asking "'Is it just a warrant?'"].)

Defendant's implicit definition would also be *under*inclusive because it would immunize from the *Edwards* rule police statements that, though not in interrogative form, clearly tend to elicit an incriminating response. (See, e.g., *People v. Gamache* (2010) 48 Cal. 4th 347, 386-387 [investigator's monologue and refutation of defendant's statements "were clearly a renewed interrogation"].) Thus, to include all questions, but only questions, within the ambit of *Miranda* and *Edwards* would go beyond their purpose in some cases while failing to achieve it in others. The *Innis* definition of interrogation squarely addresses these problems by extending the rule to any official action that should be seen as reasonably likely to elicit

an incriminating response.   Defendant's attempt to rewrite that definition must be rejected.

Finally, defendant's broadened conception of interrogation is also incompatible with the so-called "booking exception" to the *Edwards* rule, which entitles officers to ask questions germane to the custodial relationship without precluding the admission into evidence of any incriminating statements an arrestee may make in response.   (See *People v. Elizalde* (2015) 61 Cal.4th 523, 533 ["the booking exception has become firmly recognized"]; *People v. Shamblin* (2015) 236 Cal. App. 4th 1, 21-23 [in response to booking deputy's question about previous bookings, defendant said he "'knew he was caught when they took his DNA sample last time he was booked in'"; deputy then asked "why?"; neither question exceeded the bounds of booking exception].)   This exception is inherent in *Innis*'s limitation of interrogation to words or actions "other than those normally attendant to arrest and custody."   (*Innis*, *supra*, 446 U.S. at p. 301.)

Here, after defendant invoked the right to counsel the investigators discussed the documents and other materials brought with him from Glenn County, with emphasis on whether he had been advised of the charges on which he was arrested, whether he had been shown a warrant, and the whereabouts of his phone.   The first and second subjects are relevant to the question whether the arresting officers had complied with statutes requiring formal advisement of the basis for an arrest.   (See Pen. Code, § 841 [arrestee must be advised "of the cause of the arrest, and the authority to make it," and, upon request, "of the offense for which he is being arrested"]; Pen. Code, § 842 [if arrest is pursuant to warrant, warrant must be exhibited to defendant upon request]; *Johanson v. Department of Motor Vehicles* (1995) 36 Cal. App. 4th 1209, 1218 [formal advisement required "[w]hen there is an appreciable lapse in time such that the person arrested would not necessarily be familiar with the circumstances justifying the arrest"].)   Determining that these requirements had been satisfied was a legitimate area for inquiry.   In any event it did not constitute interrogation.   (See *People v. Celestine*, *supra*, 9 Cal. App. 4th at p. 1374 [when told he was under arrest for possession for sale, defendant volunteered that cocaine was for his personal use; "Far more is required to constitute 'the functional equivalent of questioning' than merely advising a person he is under arrest for a specific offense."].)   The third subject—the whereabouts of the phone—was pressed by defendant himself; he can hardly be heard to complain that the investigators interrogated him by attempting to address it.

Defendant emphasizes that the Supreme Court has repeatedly described the rule of *Edwards* as a "bright line" (*Montejo v. Louisiana* (2009) 556 U.S. 778, 797; *Arizona v. Roberson* (1988) 486 U.S. 675, 682), the merit of which "lies in the clarity of its command and the certainty of its application" (*Minnick v. Mississippi*, *supra*, 498 U.S. at p. 151).   But the line, however bright, is not crossed unless authorities continue to *interrogate* the defendant after he or she invokes the right to counsel.   As the court has said, the rule "has the virtue of informing police and prosecutors with specificity as to what they may do *in conducting custodial interrogation*, and of informing courts under what circumstances statements obtained *during such*

14

*interrogation* are not admissible." (*Fare v. Michael C.* (1979) 442 U.S. 707, 718, italics added.)   Thus the line is indeed bright with respect to the permissibility of continued interrogation after the right to counsel has been invoked.   But as the cases illustrate, what constitutes interrogation is not always so clearly delineated.   Here we are satisfied that the line, however clear, was not crossed until after defendant had expressly waived his *Miranda* rights.   Accordingly, the trial court did not err in concluding that defendant was not interrogated between the time he invoked the right to counsel and the waiver of that right.

**4. Initiation of Renewed Questioning**

Defendant acknowledges that, as stated in *Smith*, *supra*, 469 U.S. at page 95, *Miranda* and *Edwards* do not require exclusion of a defendant's statements if, after invoking the right to counsel, the defendant "initiate[s] further discussions with the police." (*Smith*, at p. 95.)   However, he contends that this rule does not apply here because he did not initiate the further communications with the investigators.

"'An accused "initiates"' further communication, exchanges, or conversations of the requisite nature 'when he speaks words or engages in conduct that can be "fairly said to represent a desire" on his part "to open up a more generalized discussion relating directly or indirectly to the investigation."'" (*People v. Waidla* (2000) 22 Cal. 4th 690, 727.)   Here defendant clearly manifested a desire to open such a discussion when he said, "There, when I was arrested, they said to me, 'Murder.'   Can you clearly explain to me what's happened or why [—]?"   This was immediately followed by a re-advisement and waiver of his *Miranda* rights.   There is no suggestion that the re-advisement, waiver, or ensuing interrogation would have occurred without defendant's triggering inquiry.   Accordingly, it must be concluded that he initiated those events.

Defendant contends that his re-initiation of discussions could justify further interrogation only if it occurred "without influence" by authorities (quoting *United States v. Whaley* (6th Cir. 1994) 13 F.3d 963, 967 (*Whaley*)), and that to be admissible, subsequent questioning must be "at the suspect's own instigation" (quoting *Shatzer*, *supra*, 559 U.S. at p. 104, as quoted in *United States v. Straker* (D.C. Cir. 2015) 800 F.3d 570, 622).   Defendant would have us construe this language to mean that a defendant's re-initiation of discussions must be entirely spontaneous.

This contention cannot be reconciled with *Innis* itself.   The defendant there was arrested on suspicion of a shooting and robbery involving a shotgun.   After he invoked his right to counsel, three officers transported him by car to the police station.   En route, two of the officers began a conversation between themselves about the hazards a discarded shotgun might pose to children, whereupon the defendant offered to take them to the shotgun.   The Supreme Court concluded that the officers' conversation did not constitute interrogation, even though it was "readily apparent" that their comments had "struck a responsive chord" with the defendant. (*Innis*, *supra*, 446 U.S. at p. 303.)   Indeed, the court agreed with the lower court that the officers

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

had "subjected" the defendant to "'subtle compulsion.'" (*Ibid.*) But, as the court went on to say, "that is not the end of the inquiry. It must also be established that a suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response." (*Ibid.*) The court concluded that the officers' conduct did not offend *Miranda* or *Edwards*. (*Innis*, at pp. 302-303.)

Here, prior to defendant's express waiver of the right to counsel, the investigators said nothing to him that they should have known was reasonably likely to elicit an incriminating response. At most they hoped to pique his curiosity by alluding to the existence of charges against him, albeit always in the context of the legitimate inquiry whether he had been apprised of those charges. This was not "interrogation" under *Innis*.

Nor is defendant aided by *Whaley*, *supra*, 13 F.3d at page 967, which described *Oregon v. Bradshaw* (1983) 462 U.S. 1039 (*Bradshaw*), as holding that a suspect initiates further discussion under *Edwards* "when, *without influence by the authorities*, the suspect shows a willingness and a desire to talk generally about his case." (*Whaley*, at p. 967, italics added.) But as with defendant's citations to overly broad descriptions of "interrogation," the cited language is dictum, which the court in *Whaley* had no occasion to explain or apply. No question was raised there about the cause of defendant's statement that he wanted to discuss his arrest with an agent; rather the case turned on whether that statement could be found to justify an interrogation conducted three weeks later by a different agent. (*Whaley*, at pp. 965, 969, fn. 5.)

Nor does *Bradshaw* support the formula attributed to it in *Whaley*. The defendant in *Bradshaw* invoked the right to counsel after receiving his *Miranda* rights. Before or during transportation to jail, he asked an officer, "'Well, what is going to happen to me now?'" to which the officer replied that the defendant was not obligated to talk to him and that if he did so, "'it has to be at your own free will.'" (*Bradshaw*, *supra*, 462 U.S. at p. 1042.) The defendant said he understood, and they then discussed "where [he] was being taken and the offense with which he would be charged." (*Ibid.*) The officer suggested a polygraph examination, to which the defendant assented. (*Ibid.*) When the polygraph examiner questioned the veracity of his account, the defendant "recanted" and made incriminating admissions. (*Ibid.*) A state court held the defendant's statements inadmissible under *Edwards*, but the Supreme Court reversed. Speaking for a plurality of four, then-Justice Rehnquist wrote, "[T]here are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to 'initiate' any conversation or dialogue. There are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards*." (*Bradshaw*, at p. 1045.) Justice Powell concurred in the judgment, but rejected

the *Edwards* rule as unworkable; he therefore cannot be viewed as endorsing the plurality's elaboration on that rule. (See *Edwards*, at pp. 1047-1051 (conc. opn. of Powell, J.).) However, Justice Marshall, on behalf of himself and three other dissenters, contested only the plurality's application of the *Edwards* rule—not its content. He wrote, "When this Court in *Edwards* spoke of '[initiating] further communication' with the police and '[reopening] the dialogue with the authorities,' it obviously had in mind communication or dialogue about the subject matter of the criminal investigation." (*Id.* at p. 1053 (dis. opn. of Marshall, J.).) Justice Marshall "agree[d] with the plurality that, in order to constitute 'initiation' under *Edwards*, an accused's inquiry must demonstrate a desire to discuss the subject matter of the criminal investigation." (*Bradshaw*, at p. 1055.) In his view the defendant there was merely inquiring into his custodial status, not inviting a general discussion of his case. (*Id.* at p. 1056.)

Critically, the *Bradshaw* court did not address any question whether the defendant's initial inquiry into what would happen to him was the product of police influence. Certainly the court did not suggest, as defendant does, that any "influence" whatsoever will vitiate a defendant's initiation of discussions about his case. Here the investigators did no more than mention the fact of the charges. No authority cited by defendant or known to us concludes that general comments obliquely alluding to the existence of charges can vitiate a defendant's own initiation of discussion concerning the substance of those charges.

### 5. Waiver

Defendant argues that the prosecution did not satisfy its burden of showing that his waiver of the right to counsel was a knowing and voluntary one. His first argument on this point rests on the premise, which we have already rejected, that defendant did not re-initiate discussions after his original invocation of the right to counsel. Beyond that his argument suggests that a number of factors cast doubt on the voluntariness of the waiver: (1) the investigators' statement that defendant could only use the phone after they finished talking to him; (2) their "simply ignor[ing]" his invocation of the right to counsel by "plow[ing] ahead with questions regarding what information Appellant possessed about the charged offense"; (3) Investigator Torres's "confusing[]" and "misleading" statement concerning defendant's rights, which immediately preceded his waiver of those rights; and (4) the failure to orally restate defendant's right to counsel.

We reject the implication that the discussion of defendant's access to a telephone introduced an element of coercion into the proceedings. Defendant introduced the subject by noting that since his arrest in Glenn County he had been unable to call his mother, as he was accustomed to doing on a regular basis. Investigator Torres told him that he would be allowed to use the phone "as soon as you finish with Investigator Rodriguez." By saying so she clearly meant to reassure defendant, not coerce him. Nor did he suggest that he was in any way dissatisfied with this assurance. Rather he voiced concern over his lack of access to his cellphone, on which his mother's number was stored. Much of the investigators' dialogue between themselves

appeared directed to finding this cell phone. Nothing in the record suggests that this effort was in any way feigned or insincere, let alone that he was led to think his ability to make a call depended in any way on his willingness to discuss the case with the investigators.

For reasons already discussed, we find no hint of coercion in the investigators' remarks following defendant's invocation of the right to counsel. Even indulging the dubious premise that those remarks amounted to "subtle compulsion," it was not such as could be found to vitiate defendant's waiver. (*Innis*, *supra*, 446 U.S. at p. 303.)

Defendant's third and fourth points seek to cast doubt on the sufficiency of the re-advisement of rights following defendant's statement that he wished to discuss the case. First he faults Investigator Torres's response to his question, "Can you clearly explain to me what's happened or why [—]?" Her reply was, "Ok, but, that's why I read you your rights, if you wanted to speak with me or not. So, you have that right at the momento [*sic*], if you want to keep speaking, however you wish and I can answer your questions, but having in mind your rights. Do you want to speak with me or not?" This remark may have lacked clarity; but we fail to see how it could confuse or mislead defendant, who had already received a full oral advisement, had stated that he understood each of the rights enumerated in the advisement, and was now given a written waiver form explaining each of those rights, again, in Spanish. Investigator Torres expressly alluded to the earlier advisement, explaining that it was intended to help him determine "if you want[ ] to speak with me or not." She noted that he had the right to do so, and asked him whether—having in mind the rights of which he had already been apprised—he wished to do so. We see no reason to doubt that he in fact had those rights in mind when he signed a paper, on which they were again enumerated, waiving them. It amply appears that defendant's waiver was freely and voluntarily given.

*Soto*, 2018 WL 2949484, at *3-10 (brackets and footnotes in original).

### b.      Applicable Federal Law

In *Miranda*, the Supreme Court held that certain warnings must be given before a suspect's statement made during a custodial interrogation can be admitted into evidence. *Miranda* requires that a person subjected to custodial interrogation be advised that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *Miranda*, 384 U.S. at 444. The warnings must precede any custodial interrogation, which occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action. *Id.*

Once properly advised of his rights, an accused may waive them voluntarily, knowingly and intelligently. *See id.* at 475. The government must prove waiver by a preponderance of the

United States District Court
Northern District of California

1    evidence.  *See Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986); *Lego v. Twomey*, 404 U.S.

2    477, 488-89 (1972); *Terrovona v. Kincheloe*, 912 F.2d 1176, 1180 (9th Cir. 1990).[7]  The waiver

3    need not be express as long as the totality of the circumstances indicates that the waiver was

4    knowing and voluntary.  *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *Juan H. v. Allen*,

5    408 F.3d 1262, 1271 (9th Cir. 2005).  There is a presumption against waiver.  *United States v.*

6    *Garibay*, 143 F.3d 534, 536 (9th Cir. 1998).  To satisfy its burden, the government must introduce

7    sufficient evidence to establish that under the totality of the circumstances, the defendant was

8    aware of "the nature of the right being abandoned and the consequences of the decision to abandon

9    it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

10            The waiver inquiry has two parts: first, it must be "voluntary in the sense that it was the

11   product of a free and deliberate choice rather than intimidation, coercion or deception," and

12   second, it must be "made with a full awareness of both the nature of the right being abandoned and

13   the consequences of the decision to abandon it."  *Berguis v. Thompkins*, 560 U.S. 370, 380 (2010);

14   *Cook v. Kernan*, 948 F.3d 952, 967 (9th Cir. 2020).  "[T]he voluntariness component turns upon

15   external factors," such as the absence of police overreaching, "whereas the cognitive component

16   depends upon mental capacity."  *Cox v. Del Papa*, 542 F.3d 669, 675 (9th Cir. 2008).  Although

17   courts often merge the two-pronged analysis, the components should not be conflated.  *Id.*  A valid

18   waiver of *Miranda* rights depends upon the totality of the circumstances, including the

19   background, experience and conduct of the defendant.  *See United States v. Bernard S.*, 795 F.2d

20   749, 751 (9th Cir. 1986).

21            Under the right to counsel established in *Miranda* and refined in *Edwards*:  "If the suspect

22   effectively waives his right to counsel after receiving the *Miranda* warnings, law enforcement

23   officers are free to question him.  But if a suspect requests counsel at any time during the

24   interview, he is not subject to further questioning until a lawyer has been made available or the

25   suspect himself reinitiates conversation."  *Davis v. United States*, 512 U.S. 452, 458 (1994)

26   (citation omitted).

27

28   _____
     [7] To solicit a waiver of *Miranda* rights, a police officer need neither use a waiver form nor ask
     explicitly whether the defendant intends to waive his rights.  *See Terrovona*, 912 F.2d at 1179.

*United States District Court*
*Northern District of California*

1    "[I]nterrogation means questioning or 'its functional equivalent,' including 'words or

2    actions on the part of the police (other than those normally attendant to arrest and custody) that the

3    police should know are reasonably likely to elicit an incriminating response from the suspect.'"

4    *Pope v. Zenon*, 69 F.3d 1018, 1023 (9th Cir. 1995) (quoting *Rhode Island v. Innis*, 446 U.S. 291,

5    301 (1980)) (confronting suspect with incriminating evidence linking him to crime plus pre-

6    *Miranda* advisement interrogation violated *Miranda* and not cured by later defective *Miranda*

7    advisement), *overruled on other grounds by United States v. Orso*, 266 F.3d 1030 (9th Cir. 2001).

8    There is an exception to the general rule regarding functional equivalent of interrogation

9    when an officer is engaged in actions which are normally attendant to arrest and custody. *See*

10   *United States v. Younger*, 398 F.3d 1179, 1186 (9th Cir. 2005) (finding that police identification of

11   defendant as person who threw backpack containing contraband onto the roof was attendant to

12   arresting and taking defendant into custody and therefore not covered by *Miranda*).  The booking

13   exception can apply to questioning even after a defendant has invoked his right to counsel if the

14   questions are biographical questions not reasonably likely to elicit an incriminating response.

15   *United States v. Zapien*, 861 F.3d 971, 976 (9th Cir. 2017) (declining to suppress statement made

16   by defendant who had invoked his right to counsel after being Mirandized, and then biographical

17   questions unrelated to the crime were asked of him to fill out a form, after which defendant said he

18   wanted to give a statement and gave an incriminating statement).  The booking exception is

19   subject to an important qualification, however:  even routine questioning may amount to

20   interrogation if a police officer has reason to know, in light of all the circumstances, that a

21   suspect's answer may incriminate him.  *United States v. Williams*, 842 F.3d 1143, 1147 (9th Cir.

22   2016) (citing *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993), and *United States v.

23   Booth*, 669 F.2d 1231, 1238 (9th Cir. 1981)).

24   The Supreme Court has held that a confession is voluntary if it is "the product of an

25   essentially free and unconstrained choice"; it is involuntary where the suspect's "will has been

26   overborne and his capacity for self-determination critically impaired."  *Culombe v. Connecticut*,

27   367 U.S. 568, 602 (1961).  To make this determination, the court must consider the totality of the

28   surrounding circumstances, including "the characteristics of the accused and the details of the

United States District Court
Northern District of California

20

United States District Court
Northern District of California

interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). "While each confession case has turned on its own set of factors justifying the conclusion that police conduct was oppressive, all have contained a substantial element of coercive police conduct." *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986). Where a suspect's statement is not coerced, "little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder." *Oregon v. Elstad*, 470 U.S. 298, 312 (1985). In *Thompkins*, the defendant's statement was not coerced because he did not claim that the police threatened or injured him and the interrogation was in a standard-sized room in the middle of the afternoon and lasted three hours. *Thompkins*, 560 U.S. at 386-87.

### c.    Analysis

The trial court found that when petitioner was initially advised of his *Miranda* rights, he "unambiguously invoked his right to an attorney." *Soto*, 2018 WL 2949484, at *5. The parties do not dispute this conclusion. Thus, the state appellate court was reasonable in deeming that the first element of an *Edwards* violation was established. *Id.*

As discussed above, *Edwards* mandates that once petitioner expressed his desire for a lawyer, he may not be subjected to interrogation until a lawyer has been made available to him, unless petitioner himself "initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85.

Petitioner makes multiple *Miranda*-related arguments that collectively, he contends, demonstrate a violation of *Edwards*. ECF No. 1-1 at 73-82. First, petitioner contends that the investigators' continued conversation with him after he initially invoked his right to counsel amounted to a continued interrogation in violation of *Edwards*. *Id.* at 73-80. Second, even though petitioner acknowledges that *Miranda* and *Edwards* do not require exclusion of a petitioner's statements if, after invoking the right to counsel, the petitioner "initiate[s] further discussions with the police," *see id.* at 81 (citing *Smith*, 469 U.S. at 95), he contends that this rule does not apply here because he did not "reinitiate[] contact with the D.A. investigators when he asked them to explain the murder charge—after over a minute of the investigators' post-invocation questions, statements and shuffling of papers. *Id.* at 81. Finally, petitioner contends that he did not

21

1    knowingly and intelligently waive his right to counsel.  *Id.* at 81-82.

2         First, petitioner contends the investigators violated *Edwards* by asking him post-invocation

3    questions.  In rejecting this argument, the state appellate court made several findings.  It stated the

4    law that "'[n]ot all conversation between an officer and a suspect constitutes interrogation . . . [and

5    that] [p]olice may speak to a suspect in custody as long as the speech would not reasonably be

6    construed as calling for an incriminating response."  *Soto*, 2018 WL 2949484, at *6.  Next, it

7    characterized the investigators' brief colloquy with petitioner as administrative and not an

8    "interrogation."  *See id.* at *6-8.  The state appellate court specifically pointed out that after

9    petitioner invoked his right to counsel the investigators discussed "the documents and other

10   materials brought with him from Glenn County, with emphasis on whether he had been advised of

11   the charges on which he was arrested, whether he had been shown a warrant, and the whereabouts

12   of his phone."  *Id.* at *8.  The state appellate court's decision that there was no interrogation under

13   *Miranda* and its Supreme Court progeny is entitled to deference on federal habeas review under 28

14   U.S.C. § 2254(d).  Petitioner must show either (1) that the state appellate court's decision was an

15   unreasonable application of clearly established Supreme Court precedent, or (2) that its decision

16   rested on an underlying unreasonable determination of fact.  *Hernandez v. Holland*, 750 F.3d 843,

17   852-53 (9th Cir. 2014).  Petitioner cannot show either.

18        The state appellate court was reasonable in determining that the first and second subjects

19   did not constitute interrogation because they were "relevant to the question whether the arresting

20   officers had complied with statutes requiring formal advisements of the basis for an arrest."  *Id.*

21   The state appellate court was also reasonable in finding no interrogation as to the third subject—

22   the whereabouts of the phone—because it was "pressed by [petitioner] himself" and "he can

23   hardly be heard to complain that the investigators interrogated him by attempting to address it."

24   *Id.*  As explained about, the investigators' dialogue with petitioner concerned a purely operational

25   matter—the inventory of his phone, which is not likely to elicit an incriminating response from

26   petitioner.  *See Edwards*, 451 U.S. at 484-485.  Thus, petitioner fails to show that the state appellate

27   court's decision was an unreasonable application of the Supreme Court's precedents in *Miranda* and

28   *Edwards*.

United States District Court
Northern District of California

22

United States District Court
Northern District of California

Next, petitioner cannot show that the state court's decision rested on an underlying unreasonable determination of fact.  An examination of the record supports the state appellate court's conclusion that neither the investigators' comments nor queries of petitioner—as to where he was arrested and the whereabouts of his phone—was reasonably likely to elicit an incriminating response.  As the trial court remarked after listening to the audio recording of the interview and reading the transcript, "[t]he statements were innocuous in that Mr. Soto had asked about his phone, and I believe the officers were trying to determine whether the phone was in the custody of the agency where he was originally arrested . . . ."  Answer, Ex. B, Volume 3 of Reporter's Transcript ("3 RT") 64.  As the state appellate court also reasonably observed, the investigators' questions were designed to comply with the state's statutes requiring formal advisement of the basis for an arrest, and "[d]etermining that these requirements had been satisfied was a legitimate area for inquiry."  *Soto*, 2018 WL 2949484, at *8.  Thus, based on the information in the record, the state courts' factual determinations were not unreasonable in light of the evidence presented at the state court proceeding.  *See Miller-El*, 537 U.S. at 340.  Accordingly, petitioner's first *Miranda* argument does not support his request for habeas relief.

Second, the state appellate court reasonably found that petitioner re-initiated communication with investigators regarding the incident when he "clearly manifested a desire to open such a discussion" when he said, "There, when I was arrested, they said to me, 'Murder.'  Can you clearly explain to me what's happened or why [—]?"  *Soto*, 2018 WL 2949484, at *8.  The state appellate court then pointed out that this statement was "immediately followed by a re-advisement and waiver of his *Miranda* rights."  *Id.*  As such, the state appellate court reasonably found that "[t]here [was] no suggestion that the re-advisement waiver, or ensuing interrogation would have occurred without [petitioner's] triggering inquiry."  *Id.*  Thus, the state appellate court was reasonable to conclude that petitioner initiated those events, and he is not entitled to relief on this second *Miranda* claim.  *Id.*

Finally, petitioner contends that he did not knowingly and intelligently waive his right to counsel.  However, the state appellate court was not unreasonable in concluding that after petitioner re-initiated communication with investigators, he thereafter validly waived his *Miranda* rights.  *Id.* at

United States District Court
Northern District of California

*10.  As the trial court observed, Investigator Torres went over "all of the rights again," and "really did more than she even was required to do to make sure . . . that he understood his rights, and then had him sign a written waiver."  3 RT 65.  The record supports the trial court's assessment. Petitioner was provided with a written waiver form, with the *Miranda* admonishments in Spanish. The investigators plainly explained that he could speak with them or not and that it was his choice. The record also reflects that petitioner repeatedly indicated verbally and in writing that he understood his rights and that he wanted to speak with them.  Given these facts, the court finds no violation of the *Edwards* rule.  *See Oregon v. Bradshaw*, 462 U.S. at 1046; *see also United States v. Jennings*, 515 F.3d 980, 986 (9th Cir. 2008) (no *Miranda* violation where, during transfer to federal custody, defendant initiated conversation about the crime after federal agents had only identified themselves and asked if defendant had any personal property to retrieve). The state appellate court also reasonably found that there was "no hint of coercion in the investigators' remarks following [petitioner's] invocation of the right to counsel" and that "[e]ven indulging the dubious premise that those remarks amounted to 'subtle compulsion,' it was not such as could be found to vitiate [petitioner's waiver]."  *Soto*, 2018 WL 2949484, at *10.  Under these circumstances, the state appellate court reasonably found that petitioner's statements to the police were not involuntary due to coercion or duress.  Accordingly, petitioner's third *Miranda* argument does not support his request for habeas relief.

Even if the trial court erred in admitting this evidence, the admission of evidence obtained in violation of *Miranda* – or *Edwards* in the instant action – is subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 295 (1991); *Ghent v. Woodford*, 279 F.3d 1121, 1126 (9th Cir. 2002) ("The erroneous admission of statements taken in violation of a defendant's Fifth Amendment rights is subject to harmless error analysis.").  In other words, habeas relief is appropriate only if the coerced confession had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Pope v. Zenon*, 69 F.3d 1018, 1025 (9th Cir. 1995) (quoting *Brecht*, 507 U.S. at 637) *overruled on other grounds by United States v. Orso*, 266 F.3d 1030, 1038 (9th Cir. 2001).  Here, the prosecution's case was strong.  Eyewitness Cruz, who knew petitioner as both a roommate and a co-worker, immediately identified him to police as the

shooter.  *See Soto*, 2018 WL 2949484, at *1.  At trial, Cruz testified in detail concerning the facts of the shooting, without contradiction.  *Id.*  There was overwhelming independent evidence presented that petitioner was living at the apartment at the time of the shooting and was in possession of the murder weapon.  *Id.* at *2.  In addition to witness testimony establishing these facts, petitioner's name was on the lease of the apartment, as were indicia that he was living at the apartment.  *Id.*  The murder weapon, which matched the weapon Cruz described as the one petitioner used to shoot the victim, was found at the scene of the crime.  *Id.*  Police attempts to find petitioner, as well as testimony from petitioner's former employer, establish that he left the area on the night of the murder, and fled to Mexico.  *Id.* at *1.  By contrast, his statements to police did not amount to a confession.  In sum, the evidence against petitioner was overwhelming, and his statements to police added little to a plethora of inculpatory evidence before the jury.  It cannot be said that the admission of petitioner's statements had a substantial and erroneous effect on the verdict.

In sum, the state appellate court's decision rejecting this claim was neither contrary to nor an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts in light of the evidence presented.  *See* 28 U.S.C. § 2254(d).  Habeas relief is denied on this claim.

### 2.    IAC for Failure to File Motion to Suppress Petitioner's Statements

Petitioner asserts that defense counsel was ineffective for failing to move to suppress petitioner's statements under *Massiah*.  ECF No. 1 at 5.  Specifically, petitioner contends that he was entitled to the presence of counsel at his interview in 2013 because a criminal complaint, which was filed in 1997, caused his Sixth Amendment rights to attach.  *Id.*

### a.    State Court Opinion

The state appellate court denied this claim on the merits as follows:

> Defendant separately contends that the questioning by Investigators Torres and Rodriguez violated his Sixth Amendment right to counsel under *Massiah v. United States* (1964) 377 U.S. 201 (*Massiah*).  In that case, the court held that "once an adversarial criminal proceeding has been initiated against the accused, and the constitutional right to the assistance of counsel has attached, any incriminating statement the government deliberately elicits from the accused in the absence of

counsel is inadmissible at trial against that defendant." (*In re Neely* (1993) 6 Cal. 4th 901, 915.)  Defendant's argument proceeds as follows: (1) The "adversarial criminal proceeding" against defendant had commenced by the time he was questioned; (2) he therefore had a Sixth Amendment right to counsel at that point; (3) the investigators elicited incriminating statements from him in violation of *Massiah*; and (4) trial counsel was prejudicially ineffective in failing to raise this as a separate ground for excluding defendant's statements.

We will assume for purposes of our analysis that the first and second premises are sound. The adversarial proceeding against defendant commenced as early as September 10, 1997, when a criminal complaint was filed against him.  (*People v. Viray* (2005) 134 Cal. App. 4th 1186, 1195, 1198.)  That proceeding remained in existence when he was arrested in March 2013.  Thus his questioning on March 26, 2013, was itself a "'critical stage'" at which he was entitled to the assistance of counsel. (*Montejo*, *supra*, 556 U.S. at pp. 786-787.)  It follows that at the time of the interview, defendant had a Sixth Amendment right to counsel as well as the Fifth Amendment right arising under *Miranda*.  (See *Montejo*, at p. 786.)

However, we see no reason to conclude that defendant's Sixth Amendment right to counsel fared any differently than his right to counsel under *Miranda*.  As this court has previously noted, one way a defendant may waive his or her Sixth Amendment right to counsel is by "initiating an 'interrogation' with known governmental authorities." (*People v. Sultana* (1988) 204 Cal. App. 3d 511, 518-519 (*Sultana*).)  The case this court cited in *Sultana* was overruled on other grounds in *Montejo*.   (See *Sultana*, at pp. 518-519, citing *Michigan v. Jackson* (1986) 475 U.S. 625 (*Jackson*), overruled in *Montejo*, *supra*, 556 U.S at p. 797.)  However, *Montejo* provides even stronger support for the conclusion that defendant waived his Sixth Amendment right to counsel along with his Fifth Amendment right: "[T]he Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. [Citations.]  The defendant may waive the right whether or not he [or she] is already represented by counsel; the decision to waive need not itself be counseled. [Citation.]  And when a defendant is read his [or her] *Miranda* rights (which include the right to have counsel present during interrogation) and agrees to waive those rights, that typically does the trick, even though the *Miranda* rights purportedly have their source in the *Fifth* Amendment:  [¶]  'As a general matter . . . an accused who is admonished with the warnings prescribed . . . in *Miranda* . . . has been sufficiently apprised of the nature of his [or her] Sixth Amendment rights, and of the consequences of abandoning those rights, so that his [or her] waiver on this basis will be considered a knowing and intelligent one.' [Citation.]" (*Montejo*, *supra*, 556 U.S. at pp. 786-787; see *People v. Henderson* (1990) 225 Cal. App. 3d 1129, 1160 ["When a complaint has been filed and an arrest has been made and the accused is not represented by counsel, there is no absolute prohibition against the police eliciting a statement from the accused so long as the waiver of the right to have counsel present is free and voluntary"], disapproved on another point in *People v. Davis* (1994) 7 Cal. 4th 797, 807.)

26

Defendant acknowledges that "a *Miranda* waiver can operate to waive the protections afforded by the Sixth Amendment . . . ." However, he continues, "the prosecution must still show that a defendant 'initiated' the contact with law enforcement if the defendant had previously invoked the right to counsel." His claim of *Massiah* error thus rests on the premise that he did not reinitiate contact. We have already rejected that premise in the context of *Miranda-Edwards*. Defendant offers no reason to think that the same question requires a different answer in the *Massiah* setting. He cites *Montejo*, *supra*, but we have already quoted the most pertinent passage of that opinion, which is contrary to his position. Beyond that he simply reprises the points he asserted in support of his claim of *Miranda-Edwards* error.

The *Massiah* rule diverges from *Miranda-Edwards* in its description of the official conduct that will require exclusion of a suspect's statements. As we have noted, the critical question under *Edwards* is whether the suspect was subjected to "custodial interrogation" without an effective waiver of his or her *Miranda* rights. (See . . . above.) Under *Massiah*, the central question is whether officers, without securing an effective waiver, "deliberately elicited" incriminating statements, either personally or through an agent. (*Massiah*, *supra*, 377 U.S. at p. 206; *Fellers v. United States* (2004) 540 U.S. 519, 523; see *People v. Williams* (2013) 56 Cal. 4th 165, 189 [defendant "fail[ed] to show any deliberate elicitation" by officers; questioning about his reports of threats to his safety "fell far short of the intentional exploitation required for a *Massiah* violation"]; *People v. Roldan* (2005) 35 Cal. 4th 646, 736 ["Deputy Munson did not deliberately elicit defendant's incriminating comments and thus did not violate his *Massiah* rights"], disapproved on another point in *People v. Doolin*, *supra*, 45 Cal. 4th at. p. 421, fn. 22.) Defendant predicates no argument on this distinction and we see no way in which it could alter our analysis.

In sum, it does not appear that a *Massiah* claim would have fared any differently from defendant's *Miranda-Edwards* claim. Accordingly, we do not find that counsel rendered ineffective assistance in failing to assert a *Massiah* objection, or that the failure was prejudicial.

*Soto*, 2018 WL 2949484, at *11-12 (brackets in original).

### b.    Applicable Federal Law

Claims of ineffective assistance of counsel are examined under *Strickland v. Washington*, 466 U.S. 668 (1984). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686. In order to prevail on a claim of ineffectiveness of counsel, a petitioner must establish two factors. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of

reasonableness" under prevailing professional norms, *id.* at 687-88, "not whether it deviated from best practices or most common custom," *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (citing *Strickland*, 466 U.S. at 690). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104 (quoting *Strickland*, 466 U.S. at 689).

Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citing *Strickland*, 466 U.S. at 693). It is unnecessary for a federal court considering an ineffective assistance of counsel claim on habeas review to address the prejudice prong, i.e., the second factor of the *Strickland* test, if the petitioner cannot establish incompetence, as required under the first prong. *Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

The standards of both 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal citations and quotation marks omitted). "[T]he question [under § 2254(d)] is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

A lawyer need not file a motion that he knows to be meritless on the facts and the law. Put simply, trial counsel cannot have been ineffective for failing to raise a meritless motion. *Juan H.*, 408 F.3d at 1273; *Anderson v. Alameida*, 397 F.3d 1175, 1180-81 (9th Cir. 2005).

The Sixth Amendment right to counsel attaches "only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois*, 406 U.S. 682, 688 (1972). Once the right to counsel attaches, counsel must be present at all "critical stages" of the prosecution, absent an intelligent waiver by the defendant. *United States v. Wade*, 388 U.S. 218, 226, 237 (1967); *United States v. Hamilton*, 391 F.3d 1066, 1070-71 (9th Cir. 2004). An accused is denied "the basic protections" of the Sixth Amendment "when there [is] used against him at his

trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah*, 377 U.S. at 206.  Put differently, once the right to counsel has attached, the Sixth Amendment is violated if the state takes action "'designed deliberately to elicit incriminating remarks.'"  *Beaty v. Stewart*, 303 F.3d 975, 991 (9th Cir. 2002) (quoting *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986)).  But such is not the case "'whenever—by luck or happenstance—the State obtains incriminating statements from the accused.'"  *Id.*

### c.  Analysis

Based on a review of the record, and applying these legal principles to petitioner's current allegations, the state appellate court's rejection of this claim was not contrary to, and did not involve an unreasonable application of, Supreme Court precedent, and was not based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

The Sixth Amendment does not bar post-indictment questioning in the absence of counsel if a defendant waives the right to counsel.  *Patterson v. Illinois*, 487 U.S. 285, 290-91 (1988).  In fact, "a defendant who has been indicted but who has not yet exercised his right to counsel may waive his Sixth Amendment right to counsel during questioning by executing a valid waiver of his *Fifth* Amendment right to counsel."  *United States v. Percy*, 250 F.3d 720, 726 (9th Cir. 2001) (noting that Supreme Court in *Patterson*, 487 U.S. at 298, held that a defendant who has received *Miranda* warnings has generally been sufficiently apprised of the nature of his Sixth Amendment rights and of the consequences of abandoning those rights that the waiver on that basis is a knowing and intelligent one).  Therefore, the state appellate court was reasonable in finding that it has "no reason to conclude that [petitioner's] Sixth Amendment right to counsel fared any differently than his right to counsel under *Miranda*."  *Soto*, 2018 WL 2949484, at *11.  The state appellate court pointed out that one way a defendant may waive his or her Sixth Amendment right to counsel is by 'initiating an 'interrogation' with known governmental authorities."  *Id.*  Thus, the state appellate court noted that petitioner's claim of *Massiah* error rested on the premise that he did not reinitiate contact.  *Id.*  Because the state appellate court had already rejected that premise

United States District Court
Northern District of California

in the context of *Miranda-Edwards*, it was reasonable in finding that petitioner offered "no reason to think that the same question requires a different answer in the *Massiah* setting. *Id.* Moreover, as mentioned above, the state appellate court's conclusion that petitioner did reinitiate contact for these purposes is a factual finding that is binding on this Court. *See* 28 U.S.C. § 2254(e)(1). The state appellate court then reasonably concluded that it "d[id] not find that counsel rendered ineffective assistance in failing to assert a *Massiah* objection, or that the failure was prejudicial." *Id.* In light of the fact that bringing an additional motion to suppress raising the *Massiah* objection would not have strengthened the legal argument or changed the analysis, it cannot be said that counsel's failure to do so was either deficient performance or prejudicial. As mentioned above, trial counsel cannot have been ineffective for failing to raise a meritless motion. *Juan H.*, 408 F.3d at 1273; *see, e.g.*, *Anderson*, 397 F.3d at 1180-81 (counsel not ineffective for failing to move to suppress confession for *Massiah* violation when such a motion would have been without merit).

Finally, petitioner fails to show the necessary prejudice. Specifically, it cannot be said that there was a reasonable probability of a different verdict even if petitioner's statement had been suppressed, given the strong evidence of petitioner's guilt.

Accordingly, petitioner is not entitled to habeas relief on this claim.

### 3.  Confrontation Clause Claim Based on Improper Testimony

Petitioner asserts that during the interview in 2013, Investigator Rodriguez told petitioner that two non-testifying witnesses—Consuela Garcia or "Chelo" and Francisco Lopez Hernandez or "Panchito"—had placed him at the murder scene. ECF No. 1 at 5. At trial, the court allowed Investigator Rodriguez to allude to the statements of these non-testifying witnesses, in violation of petitioner's Sixth and Fourteenth Amendment rights under *Crawford*. *Id.*

#### a.  State Court Opinion

The state appellate court summarized and rejected this claim as follows:

**A. Background**

Defendant contends that the trial court violated his Sixth Amendment right to confront the witnesses against him, as delineated in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), when it allowed Investigator Rodriguez to allude to statements by nontestifying witnesses placing defendant at the scene of the Avila shooting.

The procedural history of this issue is somewhat circuitous.  In an early hearing defense counsel asked that testifying officers "be admonished regarding hearsay and multiple hearsay statements" made to them during their investigation of the Avila killing.  In addition to naming two officers, whose extrajudicial statements were not offered and are not at issue here, counsel specifically referred to out-of-court statements by "Ms. Consuela Garcia, referred to as Chelo," and "Francisco Lopez Hernandez, who was actually one of the percipient witnesses, referred to as Panchito."  Counsel sought an "admonition to the witnesses . . . that they cannot refer to the hearsay statements made by those individuals because it would be a violation, not just of hearsay, but also *Crawford [v.] Washington* as well."  The prosecutor replied that he might offer some statements for their "[e]ffect on the listener to show why people did certain things, other officers.  But . . . I will admonish all officers to not mention the Don Panchito's statement," which he acknowledged was "very incriminatory."

At trial, while examining Investigator Rodriguez concerning his questioning of defendant, the prosecutor asked, "Did you actual[ly] tell [defendant] . . . that you talked to some people from murder-suicide [*sic*]?  Some witnesses."  Investigator Rodriguez replied, "I told him that I spoke to some people."  Defense counsel objected.[FN 4]  The court overruled the objection.[FN 5]  Investigator Rodriguez then testified that he "spoke to some people about the murder, not the murder/suicide."  The examination continued: "A[:] I told him some of the people we have spoken with w[ere] Emidio Cruz Guadalupe, Alejandro Jaso, Francisco Hernandez [i.e., Panchito], *and they had all told me he had been there*.  [¶]  Q[:]  And what was his response to that?  [¶]  MR. LEE:  Objection.  Hearsay.  [¶]  THE COURT:  The defendant's response would not be.  And the answer that was just given by the witness, I'm allowing that as to what he told the defendant because that affects what the defendant's response and answer is, not for the truth of what he told the defendant.  Okay.  [¶]  Q[:]  And what was his response to what you told him?  [¶]  A[:]  Again, he said he left because of the accident with the lady and that the man had happened [i.e., attempted murder-suicide], and he didn't want to be there anymore."  (Italics added.)

> FN 4:  Counsel did not specify any ground of objection at this time, but the court had granted a defense request that in limine objections be preserved for appeal without the necessity to repeat them during trial.  We will assume that this was sufficient to preserve defendant's *Crawford* and hearsay objections.

> FN 5:  So we construe the transcript.  As transcribed, the exchange was: "MR. LEE:  Objection.  [¶]  THE COURT:  Objection [*sic*].  You may answer."

Later, while examining Investigator Rodriguez in greater detail on the transcript of his questioning of defendant, the prosecutor asked, "Did you tell the defendant that people had told you what happened that night, and whether or not these people that were—," at which point

defendant interposed objections of "[h]earsay" and "[l]eading." After a sidebar conference, the court sustained the objection.

Next, defense counsel himself revisited the subject on cross-examination, apparently to establish that upon being confronted with the reported statements by third parties, defendant characterized them as "lies" and then reasserted his right to counsel: "Q[:] Okay. Toward the end of your interview with Mr. Soto, what you told him was that you told him you spoke with a bunch of people that were there. [¶] A[:] Yes. [¶] Q[:] And that you told him that they were telling you that he was there. [¶] A[:] He was at the apartment, yes. [¶] Q[:] Yeah. And that's about the time he said, 'These people are accusing me saying that I was at that place'; right? [¶] A[:] Yes. [¶] Q[:] 'When I wasn't there.' [¶] A[:] Yes. [¶] Q[:] And that's when he invoked his *Miranda* at this point; right? [¶] A[:] That's correct. [¶] Q[:] And that's when the interview terminated. [¶] A[:] Yes."

On redirect the prosecutor returned to the subject without further objection from the defense: "Q[:] . . . [Y]ou did mention to the defendant last year when you were interviewing him that you had spoken to some people, and they told you—these people told you that he was there at the apartment; correct? [¶] A[:] Correct. [¶] Q[:] And then he goes on to tell you that, 'If they told you that I was there, yes, they were lying to you'; correct? [¶] A[:] Correct. [¶] Q[:] And then you say, 'They're telling me lies?' And he says, 'Yes.' You say, 'Okay, because you weren't there.' Is that what you said to him? [¶] A[:] Yes. [¶] Q[:] And he says, 'No'; correct? [¶] A[:] Yes. [¶] Q[:] And he says—and you say, 'No. Okay'; correct? [¶] A[:] Yes. [¶] Q[:] And then he says—what did he say right after that? [¶] A[:] Can you refer me to the page. [¶] Q[:] Page 66. [¶] A[:] 'I left before that happened. I left for me for California. I was not there at that.' [¶] Q[:] And you say, 'Greenfield.' He says—[¶] A[:] 'Greenfield? Yes.' [¶] Q[:] And you say, 'Is in California.' [¶] A[:] I'm sorry. Los Angeles, California. And then he left. [¶] Q[:] And then he left. [¶] A[:] Yes. [¶] Q[:] So basically he told you these people that you were talking to were lying because he had already left Greenfield at that time. [¶] A[:] Yes. [¶] THE COURT: Let me just clarify: Was it right after that, then, that he asked for an attorney? [¶] THE WITNESS: Yes. It was shortly thereafter."[FN 6]

> FN 6: In the transcript of the interview, the described passage appears as follows: "RODRIGUEZ: And if they were to tell me that you were there that day, when this thing happened, are they lying? Are they telling me lies if they tell me that you were there? [¶] SOTO: If they told you that I was there, Yes, they are lying to you. [¶] RODRIGUEZ: They're telling me lies? [¶] SOTO: Yes. [¶] RODRIGUEZ: Ok, Why? You weren't there? [¶] SOTO: No. [¶] RODRIGUEZ: No. [¶] SOTO: No, I left before that, before that happened I left for California, I, I wasn't . . . . [¶] RODRIGUEZ: Greenfield, yes, it's in California. [¶] SOTO: Oh, sorry, to Los Angeles, California (Laughs). [¶] RODRIGUEZ: Before that day, before this day, what happened here, what [ha]ppened here, you went to Los Angeles? [¶] SOTO: Can I tell you something? I think that what with all you're telling me, I think that I do need an attorney . . . ."

On the next day the court memorialized for the record the previous sidebar proceedings concerning the above testimony, as follows:

"THE COURT: . . .  [¶]  . . . At one point there was an objection to Mr. Nong's questions about that part of the statement in which I understand Mr. Rodriguez was indicating to Mr. Soto that some individual had placed him at the scene of the murder, and he basically was saying that that was not true, or that they were lying.  I sustained an objection at sidebar.  Counsel argued it, really, and I sustained it because I had earlier excluded any references to statements by those individuals.  Although, here it wouldn't be offered for the truth anyway, but as to its [e]ffect on Mr. Soto and what his response would be.  [¶]  There is an earlier part of the statement in which a similar comment was made.  I allowed it to remain in evidence, and admonished the jurors to only consider it for the limited purpose of how it affected Mr. Soto and what his answer was then, and not—I specifically said not for the truth of the statement.  [¶]  After sustaining the objection, Mr. Lee then on cross-examination asked Mr. Rodriguez about that same part of the transcript, so I did call counsel up and indicated at that point that door was opening for Mr. Nong to go into that same part of the transcript.  [¶]  That was it.  I just wanted to put that on the record.  Anyone have anything to add?  [¶]  MR. LEE: Just to clarify your Honor, as far as me going back to that specific section, we had very early discussions having to do with issues, not just hearsay but *Crawford* issues as well, and they are very specific individuals that we have named out, and that no references could be made regarding the statements that were made.   [¶]  Regarding what was asked in that transcript, had to do with simply placing Mr. Soto at the particular scene, not any specific details about what was witnessed or otherwise, which is why I inquired about that just to make that clarification.  [¶]  THE COURT: Okay.  That's fine.  [¶]  MR. NONG: I agree, your Honor."

**B. Confrontation**

The Sixth Amendment guarantees the defendant in a criminal prosecution the right "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.)  Defendant contends that admission of the above testimony violated this right as it is articulated in *Crawford*, *supra*, 541 U.S. 36.  Under that decision, the admission of an out-of-court statement violates the right of confrontation when (1) the statement constitutes hearsay, i.e., is offered to establish the truth of the matter asserted by the absent witness; (2) the statement is "testimonial" in character; (3) the declarant is not available to be cross-examined at trial; and (4) the defendant had no prior opportunity to confront the declarant.  (*Id.* at pp. 59, 68-69.)

There is no doubt here that the second, third, and fourth conditions for exclusion are satisfied.  None of the declarants, other than Emidio Cruz, was available to be cross-examined.   The extrajudicial statements at issue here, consisting of reports to officers actively investigating a crime, were clearly "testimonial" in character. (See *Crawford*, *supra*, 541 U.S. at p. 53 ["interrogations by law enforcement officers fall squarely within th[e] class" of testimonial hearsay].)   The pivotal question thus becomes whether those

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

statements constituted hearsay, i.e., whether they were admitted for the truth of the matters asserted by the declarants, rather than for some other relevant purpose.

The confrontation clause does not "bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Crawford*, *supra*, 541 U.S. at pp. 59-60, fn. 9, citing *Tennessee v. Street* (1985) 471 U.S. 409, 414 [trial court admitted accomplice's confession to rebut defendant's claim that he was forced to confess to same facts as accomplice; "[t]he *nonhearsay* aspect of Peele's confession—not to prove what happened at the murder scene but to prove what happened when respondent confessed—raises no Confrontation Clause concerns"].)

The extrajudicial statements at issue here were not offered to prove their truth—that defendant was at the scene of the shooting—but to establish defendant's response when he was told about them. Indeed the statements themselves were not placed into evidence as such. Investigator Rodriguez was not asked what the declarants said, but rather what *he told defendant* they had said. This was relevant because, rather than simply admitting or denying his presence, defendant gave a response that the jury was entitled to find nonsensical and evasive: that "he left because of the accident with the lady and that the man had happened, and he didn't want to be there anymore." As Investigator Rodriguez explained, defendant used "the accident" to refer to the attempted murder-suicide that occurred some four months before the Avila shooting. Defendant was thus claiming to have left the area sometime between the attempted murder-suicide and the Avila shooting. This was implausible, if not incredible, for two reasons: First, defendant was only implicated in the attempted murder-suicide as a witness; nothing before the jury attempted to explain why this event might have motivated defendant to flee the area.

Second, and more tellingly, even if jurors believed the attempted murder-suicide might have had such an effect, the evidence clearly showed that defendant did *not* leave Greenfield when it occurred. Instead, some three weeks after that event, he applied for and, as the jury was virtually certain to find, moved into an apartment in Greenfield—the same apartment where Avila was ultimately killed. Indeed, evidence before the jury strongly pointed to a finding that defendant was in Greenfield on August 30, 1997—the date of the shooting—and the testimony of Pedro Dominguez supported an inference that defendant hurriedly left Greenfield that or the following night. Dominguez testified that on a night in August 1997, defendant appeared at his home, in an excited state, with no luggage or belongings, seeking a ride to Fresno or Southern California. Dominguez did not specify the date of this encounter, but defendant's last paycheck from the Dominguez enterprise, which was admitted into evidence without objection, shows that he worked six hours on August 30, the date of the killing. Dominguez, as the foreman supervising the crew including defendant, must have seen him at work that day. But Dominguez testified that the evening encounter in which defendant sought a ride out of town was the last time he saw defendant before trial. It follows that the encounter must have occurred on the evening of August 30, or on the next day, August 31.

This evidence amply supports an inference that defendant came to Dominguez seeking a ride shortly after the shooting.

Because the third-party statements were offered only to show defendant's response to them during questioning, it did not matter whether they were true or even whether Investigator Rodriguez's account of them was true.  What mattered was that, faced with an accusation of presence at the murder scene, defendant attempted to controvert it by presenting an account that the jury was likely to find contrived and incredible.  This is the answer to defendant's insistence that the extrajudicial statements were necessarily admitted for their truth because his denials of them could have no probative value unless they were true.  We agree that a suspect's mere contradiction of incriminating assertions has no tendency by itself to prove either guilt or innocence, but is equally compatible with both.  Here, however, defendant did not merely deny that he was present at the scene of the crime.  He responded to the statements placing him at the scene by insisting that he had *left the area* at the time of the killing.  The investigators' account of the witnesses' reports was not admitted to establish their truth, but to establish the predicate for defendant's fabrications when confronted with those reports.

As the jury was instructed, a willfully false statement by defendant could support an inference of guilty knowledge.[FN 7]  His claim to have left the area prior to the shooting, if willfully false, would support such an inference.  So long as the challenged statements were offered for that purpose—and not to prove their truth—their admission did not implicate the confrontation clause.  (See *People v. Riccardi* (2012) 54 Cal. 4th 758, 801, fn. 21 [detective's statements to witness in recorded interview did not offend confrontation clause because they were "admitted for the nonhearsay purpose of giving context to [the witness's] answers"], overruled on another point in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216; *People v. Mendoza* (2007) 42 Cal. 4th 686, 697-699 [adolescent murder victim's accusations that defendant molested her, as testified to by victim's mother, were admissible over *Crawford* objection for nonhearsay purpose of establishing defendant's motive to kill victim]; *People v. Combs* (2004) 34 Cal. 4th 821, 842 [companion's statements in defendant's presence about his commission of murder did not offend confrontation right because they "were not admitted for purposes of establishing the truth of the matter asserted, but . . . to supply meaning to defendant's conduct or silence in the face of [companion's] accusatory statements"]; cf. *People v. Rangel, supra*, 62 Cal. 4th at p. 1215, fn. 7 [acknowledging but not reaching issue of extent to which admission of a hearsay statement as an adoptive admission implicates Sixth Amendment].)

> FN 7: As given here, the instruction states: "If the defendant made a false or misleading statement before this trial relating to the charged crime knowing the statement was false or intending to mislead, that conduct may show he was aware of his guilt of the crime, and you may consider it in determining his guilt.  If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance.  However, evidence that the defendant made such

a statement cannot prove guilt by itself." (See CALCRIM No. 362.)

Defendant cites *People v. Chatman* (2006) 38 Cal. 4th 344, 377-382 (*Chatman*), which addresses the propriety of courtroom cross-examination in which a defendant is asked whether other witnesses were lying when they gave incriminating testimony. The *Chatman* court held that such questioning may be permissible under specified conditions. (*Id.* at p. 382.) Defendant contends that none of these conditions were present here, and that as a result, the trial court should have excluded any reference to the extrajudicial statements. But this case bears little if any resemblance to *Chatman*. Defendant did not testify, and therefore was not confronted with accusatory statements on the witness stand. More to the point, the testimony here was introduced not to attack defendant's credibility as a witness or as an indirect mode of arguing to the jury, but to show that when confronted with reports of his presence at the scene, defendant not only denied them but went further and denied even being in that part of the state. The jury could readily find that denial to be a deliberate falsehood reflecting guilty knowledge. Nothing comparable appears in *Chatman*.

We conclude that the challenged testimony was properly admitted for a nonhearsay purpose and that it therefore did not trigger defendant's right to confront the declarants.

*Soto*, 2018 WL 2949484, at *12-16 (footnotes and brackets in original, brackets in "[:]" added).

**b.    Applicable Federal Law**

The Confrontation Clause of the Sixth Amendment provides that in criminal cases the accused has the right to "be confronted with the witnesses against him." U.S. Const. amend. VI. The federal confrontation right applies to the states through the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

The ultimate goal of the Confrontation Clause is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *Crawford*, 541 U.S. at 61. It does not command that evidence be reliable, but rather that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. *Id.*; *see Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (noting a primary interest secured by the Confrontation Clause is the right of cross-examination).

The Confrontation Clause applies to all out-of-court testimonial statements offered for the truth of the matter asserted, i.e., "testimonial hearsay." *See Crawford*, 541 U.S. at 51. Out-of-court statements by witnesses that are testimonial hearsay are barred under the Confrontation Clause unless (1) the witnesses are unavailable, and (2) the defendants had a prior opportunity to

1   cross-examine the witnesses.  *Id.* at 59.  Police testimony describing or outlining statements from a

2   witness in lieu of the witness's live testimony constitutes testimonial statements subject to the

3   Confrontation Clause.  *Ocampo v. Vail*, 649 F.3d 1098, 1108-10 (9th Cir. 2011).  The

4   Confrontation Clause does not bar, however, the use of testimonial statements for purposes other

5   than establishing the truth of the matter asserted.  *Crawford*, 541 U.S. at 59 n.9.

6        Confrontation Clause claims are subject to harmless error analysis.  *United States v.*

7   *Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004).  For purposes of federal habeas corpus review, the

8   standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence

9   had an actual and prejudicial effect upon the jury.  *See Hernandez v. Small*, 282 F.3d 1132, 1144

10   (9th Cir. 2002) (citing *Brecht*, 507 U.S. at 637 (1993)).

### c.        Analysis

12        Applying these principles, the state appellate court was not unreasonable in rejecting

13   petitioner's Confrontation Clause claim.  *See Soto*, 2018 WL 2949484, at *12-16.  The state

14   appellate court pointed out that the information Investigator Rodriguez provided concerned what

15   these non-testifying witnesses, specifically Francisco Lopez Garcia or "Panchito," said about

16   petitioner and was *not* offered for the truth of the matter—that petitioner was at the scene of the

17   shooting.  *Id.* at *15.  Instead, the state appellate court stressed that the statements were offered "to

18   establish [petitioner's] response when he was told about them."  *Id.*  The state appellate court

19   noted that petitioner "responded to the statements placing him at the scene by insisting that he had

20   *left the area* at the time of the killing."  *Id.* (emphasis in original).  Thus, the state appellate court

21   found these statements to be nonhearsay upon concluding that "[t]he investigators' account of the

22   witnesses' reports was not admitted to establish their truth, but to establish the predicate for

23   [petitioner's] fabrications when confronted with those reports."  *Id.*  The state appellate court's

24   finding that the statements were not hearsay is entitled to a presumption of correctness, which

25   must be overcome by petitioner.  *See Miller-El*, 537 U.S. at 340; *see also Ortiz-Sandoval v.*

26   *Gomez*, 81 F.3d 891, 897 (9th Cir. 1996).  Such correctness is bolstered by the jury instructions

27   given.  The state appellate court explained that "[a]s the jury was instructed, a willfully false

28   statement by defendant could support an inference of guilty knowledge" and "[h]is claim to have

left the area prior to the shooting, if willfully false, would support such an inference." *Soto*, 2018 WL 2949484, at *16.  The state appellate court reasonably concluded that "[s]o long as the challenged statements were offered for that purpose—and not to prove their truth—their admission did not implicate the confrontation clause." *Id.*  Nothing on the record overcomes the presumption that the trial court appropriately limited the evidence to nonhearsay purposes.  Because the statements were offered for a nonhearsay purpose, petitioner's Confrontation Clause claim necessarily fails.

Even if admission of such statements violated petitioner's right to confrontation, no prejudice ensued.  Eyewitness Cruz, petitioner's co-tenant, provided a detailed account of the shooting.  *See Soto*, 2018 WL 2949484, at *1-2.  He promptly identified petitioner to police as the shooter.  *Id.*  Circumstantial evidence supported his account and identification—petitioner was living at the apartment at the time of the shooting and he had been in possession of a rifle that matched the murder weapon.  *Id.* at *2, 4.  The record also showed that petitioner left the area on the night of the murder and moved out of town, strongly indicating a consciousness of guilt.  *Id.* at *1, 4.  Therefore, it cannot be said that the admission of non-testifying witnesses identifying petitioner as being at the scene had a substantial and erroneous effect on the verdict.  Accordingly, this claim is denied.

### 4.    IAC for Failure to Request Curative Instruction

Petitioner alleges that defense counsel was ineffective for failing to request a curative instruction regarding the statements of the non-testifying witnesses (who placed petitioner at the crime scene), in violation of his Sixth and Fourteenth Amendment rights.  ECF No. 1 at 7.

#### a.    State Court Opinion

The state appellate court summarized and rejected this claim as follows:

> Defendant contends that counsel was ineffective when he failed to request "modified curative instructions regarding the admission of the statements of the nontestifying witnesses."
>
> In its initial ruling allowing Investigator Rodriguez to allude to third-party statements, the court explained in the jury's presence that it was "allowing that as to what he [i.e., Investigator Rodriguez] told the defendant because that affects what the defendant's response and answer is, not for the truth of what he told the defendant."  This was

apparently the statement to which the court referred when it later remarked that it had "admonished the jurors to only consider it for the limited purpose of how it affected Mr. Soto and what his answer was then, and not—I specifically said not for the truth of the statement." In another part of his brief, defendant faults this "attempt at a curative instruction" because it "relied on the jury understanding the legal (and unexplained) concept of admitting a statement 'not for the truth,' which is inherently confusing and ambiguous for lay persons without any formal legal training.  [Citation.]  The limiting instruction was also incomplete, since the jury was never told that it could not draw inferences from the testimony, such as . . . that Don Panchito—who Rodriguez testified he had interviewed . . .—had identified Appellant as the murderer.  In addition," he concludes, "the instruction was never repeated to the jury, either when Rodriguez testified again regarding the statements of the non-testifying witnesses . . . or during the closing instructions."

It is true that no further admonition was given to the jury specifically concerning Investigator Rodriguez's testimony alluding to third-party statements placing defendant at the murder scene.  However the court's charge to the jury did include the standard instruction that evidence admitted for a limited purpose could be considered "only for that purpose and for no other."  (See CALCRIM No. 303.)

In any event defendant does not charge instructional error.  As he implicitly acknowledges, the trial court "'generally [has] no duty to instruct on the limited admissibility of evidence'" in the absence of a specific request for such an instruction.  (*People v. Valdez* (2012) 55 Cal. 4th 82, 139; see Evid. Code, § 355 [trial court "upon request shall restrict the evidence to its proper scope and instruct the jury accordingly"]; cf. Evid. Code, § 353 [waiver of evidentiary objection not asserted in trial court].)  Failure to make such a request ordinarily forfeits the issue on appeal.  (See *People v. Fuiava* (2012) 53 Cal. 4th 622, 728 [where trial court sustained objections to improper argument, defendant's failure to request further admonition forfeited any contention that court's action was insufficient to forestall prejudice].)  Defendant does not suggest that the present case falls within an exception to this rule.  (See *People v. Collie* (1981) 30 Cal. 3d 43, 64 ["There may be an occasional extraordinary case in which unprotested evidence . . . is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose."].)  Instead he contends that failure to seek a more pointed admonition constituted ineffective assistance of counsel.

To succeed, a claim of ineffective assistance of counsel requires a showing that (1) counsel's performance was deficient; and (2) the defendant suffered prejudice as a result.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687.)  For such a claim to succeed on direct appeal, as distinct from a collateral proceeding such as habeas corpus, both of these factors must appear from the record.  (See, e.g., *People v. Mickel* (2016) 2 Cal. 5th 181, 198-200.)  In such a case, a finding of deficient performance is warranted "only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [the challenged] act or omission."  (*People v. Fosselman* (1983) 33 Cal. 3d 572, 581; see *People v. Wilson* (1992) 3 Cal. 4th 926, 936

["'[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected."].)

Defendant contends that "there could have been no tactical or strategic reason for failing to seek a proper curative instruction" because the prosecution case depended on "a single (intoxicated) witness," such that the reported statements of other declarants placing him at the scene "were disastrous for the defense." Since counsel had objected to the statements, the argument continues, he "had decided to try to keep [them] out," and he "could not have been seeking to avoid drawing attention" to them because he "subsequently re-elicited the statements during cross-examination."

We reject all of these premises. It is true that the single eyewitness, Emidio Cruz, had been drinking beer—perhaps a goodly amount of it, and perhaps to the point of at least moderately advanced intoxication, though all the evidence showed was that 41 cans of beer had been consumed in the apartment over an unknown time preceding the shooting. But even if the jurors believed he was intoxicated they were unlikely to doubt the essential accuracy of his testimony on that ground. An inebriated person may make all sorts of mistakes of perception and interpretation, but reasonable jurors would be unlikely to suppose that any level of inebriation short of unconsciousness would have caused Cruz to misperceive or misrecollect an event as stark and vivid as the sudden, cold-blooded shooting he said had taken place before his eyes. Retired Officer Cabrera, who questioned Cruz on the night of the shooting, described him as "almost in shock," but there was no suggestion that he was too intoxicated to perceive, recollect, or communicate the events he had witnessed.[FN 8]

> FN 8: Officer Cabrera testified on cross-examination that he did not administer a preliminary or other alcohol test to Cruz. On redirect he testified that Cruz was not "falling over," "stumbling in any way," or slurring his words. According to the officer, "He just—he had difficult [sic] to talking to me. And, I mean, it was my impression that it was because he was shaken up from what he had witnessed." The court asked whether the officer recalled "any signs of him being under the influence," to which the officer replied, "No. I would have stated that on my report. So I do not recall any signs of him being under the influence at all."

Nor were the statements placing defendant at the scene nearly as devastating as he makes out. Ample evidence established that he resided in the apartment prior to the shooting, that he possessed a rifle like the murder weapon, and that he disappeared from the area immediately after the killing. Indeed, he left in such a hurry that he did not pick up his final paycheck, though he later made some effort to have it sent to him.

Coupled with his own denials and obfuscations, the foregoing evidence furnished ample basis to credit Cruz's account, even if jurors had some reason to question it. In fact, the jury was offered no

United States District Court
Northern District of California

alternative explanation for the evidence.  There was no suggestion that Cruz was lying or had any reason to do so.

As for counsel's reasons for objecting to the statements and then eliciting further testimony regarding them, it seems most likely that he preferred to keep them out but, having lost that battle in light of the nonhearsay purpose for which the statements were admitted, wished to make clear to the jury that when confronted with the statements defendant flatly denied them.  As we have noted, if he had stopped there the statements might not have been admissible on the ground stated or might have been objectionable on the ground that his denials had no tendency in reason to prove either guilt or innocence.  But he did not stop by simply denying his presence.  He went on to assert what the jury was almost certain to find to be a knowing and evasive falsehood—that he had left the area at some unspecified time, implicitly prior to the shooting, as a reaction to the so-called murder-suicide that took place some four months earlier.  In that context defense counsel may be seen as trying to tread a fine line between overemphasizing the extrajudicial statements and seeking to minimize their effect or even turn them to his advantage by raising the possibility of a false narrative concocted by Cruz and the extrajudicial declarants.  In any event we cannot say on this record that counsel had no tactical reason for failing to bring further attention to the statements.

A finding of prejudicial ineffective assistance is warranted only if the record discloses "a reasonable probability that, but for counsel's unprofessional errors, the result would have been more favorable to the defendant."  (*In re Ross* (1995) 10 Cal. 4th 184, 201.)  Here we find no reasonable probability that a more pointed admonition concerning the limited admissibility of the third-party statements would have produced a result more favorable to defendant.  In addition to the points just discussed—all indicating that there is no reasonable probability that defendant would not have been convicted in the absence of that testimony—the admonition the jury received likely prevented the jury from considering those statements for the truth of their contents.  When the court admitted the evidence, it stated that it was allowing Investigator Rodriguez's statements to defendant regarding the extrajudicial reports placing him at the scene "because that affects what the defendant's response and answer is, *not for the truth of what he told the defendant*."  (Italics added.)  At the close of trial the court gave the standard instruction admonishing jurors that evidence admitted for a limited purpose could be considered "only for that purpose and for no other."  (See CALCRIM No. 303.)  We cannot assume that the jury failed to put these two directives together in analyzing the testimony it heard.

Finally, we cannot accept defendant's contention that great weight should be placed on the questions submitted by jurors seeking additional information about the crime and its circumstances.  Defendant contends that jurors exhibited "keen interest" in the third-party statements when they asked, "Was Don Panchito ever interviewed on 8/30/97?" and "Can we get any info regarding Panchito's or Cello's [*sic*] police statements?"[FN 9]  But jurors knew from other testimony that officers had taken statements from other witnesses.  They were undoubtedly curious about what more those

statements might reveal about the case, particularly on the question of the motive for the shooting, as to which the record reveals nothing. Thus jurors also asked whether "Chelo," defendant's girlfriend, ever "date[d]" the victim, whether "the deceased had a relationship with the defendant," and whether "the deceased had an argument with the defendant prior to the incident."  On a similar theme, one juror, apparently hoping the questions would be directed to Emidio Cruz, wanted to know, "Did you or Ilario [*sic*] ever tease Julio [i.e., defendant] for dating a prostitute," and "Being that Chelo was a prostitute, did anyone living in the apartment besides Julio have sexual relations with her?"

> FN 9: Without objection, the court put the first question to the witness, Investigator Rodriguez, who responded that "Don Panchito" was interviewed on the date of the killing.  The second question was asked during deliberations, and the court responded that "[t]he answer is no, pursuant to the Rules of Evidence."

None of these questions suggests that the jurors placed undue emphasis on third-party statements.  The court had an announced practice of encouraging jurors to submit questions throughout the trial.  It is hardly surprising that jurors felt free to ask what else might be known about the shooting.  These questions demonstrate no more than natural curiosity about undisclosed parts of the police investigation.  When the court deemed the questions proper it put them to the appropriate witnesses.  Otherwise, it responded to them by informing the jury that the rules of evidence precluded an answer.  We see nothing in these aspects of the proceeding that suggests the evidence here challenged by defendant or counsel's failure to request a more explicit admonition concerning its limited admissibility, played a dispositive or even significant role in the jury's deliberations.

In sum, this record cannot sustain a claim that counsel rendered deficient assistance by failing to request a more explicit limiting instruction, or that the failure to do so affected the outcome.

*Soto*, 2018 WL 2949484, at *16-19 (brackets in original, [*sic*] added).

### b.    Applicable Federal Law

The legal standard for IAC claims has been outlined above.  *See supra* DISCUSSION Part III.B.2.b.

### c.    Analysis

The state appellate court was not unreasonable in concluded that petitioner failed to establish either deficient performance or prejudice in failing to request the curative instruction. *Soto*, 2018 WL 2949484, at *16-19.  As the state appellate court observed, the jury received the more general admonition, namely, that evidence admitted for a limited purpose could be considered "only for that purpose and for no other."  *Id.* at *17.  The jury was also told by the trial

United States District Court
Northern District of California

court contemporaneously to the specific testimony by Investigator Rodriguez, that his statements to petitioner regarding the extrajudicial reports placing him at the scene were admissible because they were not being admitted for the truth of what he told the defendant, but for the purpose of effect on the listener. *Id.* at \*16. Considered together, trial counsel could reasonably have concluded that the jury would follow these directives. Also, the state appellate court reasonably found that counsel was "trying to tread a fine line between overemphasizing the extrajudicial statements and seeking to minimize their effect or even turn them to his advantage by raising the possibility of a false narrative." *See Soto*, 2018 WL 2949484, at \*18. Thus, the state appellate court was reasonable in concluding that it "cannot say on this record that counsel had no tactical reason for failing to bring further attention to the statements." *Id.* In fact, additional instructions could have highlighted the statements. *See Musladin v. Lamarque*, 555 F.3d 830, 844 (9th Cir. 2009) ("the decision not to request a limiting instruction is 'solidly within the acceptable range of strategic tactics employed by trial lawyers in the mitigation of damning evidence,'" citation omitted).

In addition, the state appellate court was not unreasonable in concluding that petitioner suffered no prejudice, as the evidence establishing petitioner's presence at the scene was established by an eyewitness who lived with petitioner and had no motive to lie. *See Soto*, 2018 WL 2949484, at \*17-18. And, as the state appellate court observed, there was substantial evidence established that petitioner "resided in the apartment prior to the shooting, that he possessed a rifle like the murder weapon, and that he disappeared from the area immediately after the killing." *See id.* at \*18. Given the overwhelming evidence of guilt, the state appellate court was not unreasonable in concluding that petitioner was not prejudiced. *See Thompkins*, 560 U.S. at 390 (concluding that it "seemed doubtful" that defense counsel's failure to request a limiting instruction was deficient performance, but even if it was, it was not prejudicial in light of other instructions and compelling evidence of guilt). Accordingly, habeas relief is denied on this IAC claim.

United States District Court
Northern District of California

### 5. Prosecutorial Misconduct

Petitioner asserts that the prosecutor committed misconduct in violation of petitioner's

Sixth and Fourteenth Amendment rights by eliciting the statements of the non-testifying witnesses

in violation of *Crawford*.  ECF No. 1 at 7.

### a. State Court Opinion

The state appellate court summarized and rejected this claim as follows:

### 1. Preservation of Objection

Defendant separately contends that the prosecutor committed misconduct by eliciting the testimony from Investigator Rodriguez alluding to extrajudicial statements placing defendant at the scene of the murder.  At the threshold we question whether this claim of error has been preserved for appellate review.  The general rule is that "[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety."  (*People v. Thornton* (2007) 41 Cal. 4th 391, 454.)  Exceptions have been noted where (1) "a timely objection and/or a request for admonition . . . would be futile," (2) "'"an admonition would not have cured the harm caused by the misconduct,"'" or (3) "'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request.'"  (*People v. Hill* (1998) 17 Cal. 4th 800, 820 (*Hill*).)

Defendant does not attempt to bring this case within any of these exceptions.  Instead he contends that an objection to the asserted misconduct was preserved for appeal by his "object[ion] to the admission of the statements of the non-testifying witnesses under the hearsay rule and *Crawford*."  He cites *Chatman*, *supra*, 38 Cal. 4th at pp. 379-380, and *People v. Zambrano* (2004) 124 Cal. App. 4th 228, 237 (*Zambrano*).  Neither of these decisions suggests that an evidentiary objection may serve as the predicate for a claim of prosecutorial misconduct on appeal.  Instead the courts in both cases concluded that the trial court's *rulings* on evidentiary objections established that an objection to the prosecutor's conduct would have been futile.  (*Chatman*, at p. 380; *Zambrano*, at pp. 236-237.)  In the latter case, the court acknowledged that this exception is to be applied "only in 'unusual circumstances.'"  (*Zambrano*, at p. 237, quoting *Hill*, *supra*, 17 Cal. 4th at p. 821, and *People v. Riel* (2000) 22 Cal. 4th 1153, 1212-1213.)  Defendant makes no attempt to establish that an objection here would have been futile, let alone that the circumstances were sufficiently unusual to excuse the requirement of an objection.  (See *People v. Erickson* (1997) 57 Cal. App. 4th 1391, 1403 ["strongly doubt[ing]" that objection to misconduct was preserved for appeal where defense "made an ordinary evidentiary objection and received a favorable ruling on it"].)

Nonetheless, because a charge of prosecutorial misconduct is a serious one and because the record here fails to disclose any misconduct, we will discuss the claim on its merits.

### 2. Merits

Defendant cites the rule that "[i]t is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order." (*People v. Crew* (2003) 31 Cal. 4th 822, 839.) According to defendant, the prosecutor violated a ruling "expressly exclud[ing] . . . testimony regarding out-of-court statements . . . by non-testifying witnesses." Defendant also suggests that the prosecutor committed misconduct by "'deliberate[ly] asking . . . questions calling for inadmissible and prejudicial answers . . . .'" (Quoting *People v. Bell* (1989) 49 Cal. 3d 502, 532.) He notes that "'[s]uch misconduct is exacerbated if the prosecutor continues to attempt to elicit such evidence after defense counsel has objected.'" (Quoting *People v. Smithey* (1999) 20 Cal. 4th 936, 960.)

The argument presupposes that the testimony was elicited in violation of an order restricting evidence of extrajudicial statements about the crime. We have already concluded that the evidence was admissible for a nonhearsay purpose. We must also conclude, on this record, that it did not violate the in limine order on which defendant predicates his argument. That order was at best ambiguous and, at least as apparently understood by the prosecutor and the trial court, did not apply to the testimony now targeted by defendant.

The colloquy leading to the order began when defendant alluded to his written motion in limine No. 12. As written, that motion sought to exclude only "hearsay evidence contained in reports of Corporal Sanchez, who is now deceased," with specific reference to "Corporal Sanchez's conduct, observations, and interviews" as well as "evidence regarding Corporal Sanchez's photo line-up shown to Consuelo Garcia, Francisco Hernandez, and Emidio Cruz." Nothing in the record establishes that any of the extrajudicial matters specified in that motion were offered at trial. Indeed, the record fails to establish that the statements to which defendant now objects were contained in reports by Corporal Sanchez, as distinct from other officers. In any event the court at first appeared to make an order that, while ambiguous, could be construed more broadly. After determining that the prosecutor had no objection to the written motion in limine, the court said, "That's granted. So *nothing about those individuals who aren't present, their photo identification and statements*." (Italics added.)

Had the discussion ended there, the court's ruling might have been understood to bar any mention of statements attributed to absent persons. The colloquy continued, however, with defense counsel stating, "There's several individuals that are not present that were present back then who were interviewed and whose names came up. And I expressed my concern with [the] prosecutor that because we have a lot of officers looking back through the previous reports trying to refresh their recollection, that there is concern about hearsay, and so defense would definitely request that *officers and witnesses be admonished* regarding *hearsay and multiple hearsay statements*.

Specifically, there's four individuals that are not present.  And that would be Ms. Consuela Garcia, refer[r]ed to as Chelo.  And Francisco Lopez Hernandez, who was actually one of the percipient witnesses, refer[r]ed to as Panchito.  And along with the Corporal Sanchez, also John Stewart is not testifying.  And he too took down a lot of reports 17 years ago.  [¶]  And so the discussion and the *admonition to the witnesses* would be that they cannot refer to the *hearsay statements made by those individuals* because it would be a violation, not just of hearsay, but also *Crawford [v.] Washington* as well."  (Italics added.)

The court asked the prosecutor to comment on these remarks, leading to the following exchange:

"MR.  NONG: Your Honor, I was focusing on the percipient witnesses, Chelo and Mr. Don Panchito.  The officers—there may be statements in there that aren't incriminatory, but may be used for by the People for its [e]ffect on the listener to show why people did certain things, other officers.  But the one that's really important, your Honor, is *I will admonish all officers to not mention Don Panchito's statement.*  The statement is very incriminatory.  So I'll mention that.  [¶]  THE COURT: I appreciate that.  And you're right.  *Certain other statements may be allowed for a limited purpose.*  So that's fine.  Thank you."  (Italics added.)

On its face this colloquy was directed to *admonishing officers* against repeating extrajudicial statements about the crime while testifying.  A prosecutor may indeed commit misconduct by failing to comply with an order to ensure that witnesses avoid volunteering specified facts in their testimony.  (See, e.g., *People v. Glass* (1975) 44 Cal. App. 3d 772, 781-782.)  But we cannot say that this occurred here.  The questions alleged to violate the court's in limine order did not seek the recapitulation of statements made to police officers by extrajudicial declarants but of questions posed by officers *to defendant*—and most importantly, defendant's response thereto.  That the questions thus posed alluded to statements by witnesses did not place them within the scope of the court's order.  As previously noted, the probative purpose for which the statements were mentioned lay not in their truth, but in defendant's incredible claim of having left the area.

That the questions did not offend the in limine order is reflected in the fact that the trial court *overruled* defendant's objection when the supposedly offending question was first posed, stating that it was "allowing" inquiry "as to what [Investigator Rodriguez] told the defendant because that affects what the defendant's response and answer is, not for the truth of what he told the defendant."  The court apparently viewed Investigator Rodriguez's statements as falling within the express reservation in its previous order for statements "allow[able] for a limited purpose."  We cannot conclude that the prosecutor violated the court's in limine ruling by posing questions which the trial court itself considered outside the scope of that ruling.  What the Supreme Court said of a similar claim of misconduct applies fully here: "'Although it is misconduct for a prosecutor *intentionally* to elicit inadmissible testimony [citation], merely eliciting evidence is not misconduct. . . .' [Citation.]  Although the prosecutor in this case certainly asked the questions intentionally, nothing in the record

46

suggests he sought to present evidence he knew was inadmissible, especially given that the court overruled defendant's objections . . . ." (*Chatman*, *supra*, 38 Cal. 4th at pp. 379-380.)

Nor does this case resemble those cited by defendant in which misconduct was found. In *People v. Wallace* (2008) 44 Cal. 4th 1032, 1071, the prosecutor "defied a court order" by questioning the defendant about the contents of a defense investigator's report. In *Bell*, *supra*, 49 Cal. 3d 502, 531, the prosecutor entered into a stipulation excluding the testimony of a confidential informant and then asked a defense expert about an incriminating statement by the informant—a question that was "clearly misconduct" because it was irrelevant to the witness's opinion testimony and thus constituted "'[t]he deliberate asking of questions calling for inadmissible and prejudicial answers . . . .'" (*Id.* at p. 532.)[FN 10]

> FN 10: In both of these cases the misconduct was found to be harmless—in the first under the standard governing state law error (*Wallace*, *supra*, 44 Cal. 4th at p. 1071), and in the latter—in which the error was assumed of federal constitutional dimensions—under the beyond-a-reasonable-doubt standard (*Bell*, *supra*, 49 Cal. 3d at p. 534; see pp. 541-542).

Defendant asserts that the questioning here constituted misconduct for the further reason that Investigator Rodriguez's testimony misstated the evidence. He points to discrepancies between the witness's trial testimony and the contents of the interview transcript on which the challenged examination was based. We find the discrepancy trivial, and probably the result of the witness's inadvertent conflation of two separate passages in the transcript. At trial Investigator Rodriguez testified that he had told defendant that "some of the people we had spoken with w[ere] Emidio Cruz Guadalupe, Alejandro Jaso, [and] Francisco Hernandez, and they had all told me he had been there," to which defendant replied that "he left because of the accident with the lady and that [*sic*] the man had happened . . . ." In fact the cited list of witnesses appears at an earlier point of the interview transcript, and the statement attributed to them at that point was not that defendant was present at the scene of the crime, but that he lived at the apartment where the shooting occurred. Later in the transcript, Investigator Rodriguez asked defendant whether he knew people named "'Güero,'" "Julio, Eladio," Don Panchito, or "Marcario."[FN 11] Investigator Rodriguez then asked, "And if they were to tell me that you were there that day, when this thing happened, are they lying? Are they telling me lies if they tell me that you were there?" Defendant replied, "If they told you that I was there, Yes, they are lying to you."

> FN 11: Two of these names are recognizable as nicknames, respectively, for defendant himself ("Güero") and Francisco Hernandez ("Don Panchito"). The other two, or perhaps three, are not explained in the record.

The discrepancy cited by defendant is thus revealed as a discrepancy between two lists of names—"Emidio Cruz Guadalupe, Alejandro Jaso, [and] Francisco Hernandez," on the one hand, and "'Güero,'"

"Julio, Eladio," "Don Panchito," and "Marcario" on the other.   It affirmatively appears from the record that two of the witnesses named at trial—Emidio Cruz and Francisco Hernandez—were indeed among those who placed defendant at the scene.   Cruz testified at trial and placed defendant at the scene, and also placed the murder weapon in his hands.   Hernandez was elsewhere identified as the man known by the nickname "Don Panchito," who was among the witnesses to whom Investigator Rodriguez, in questioning defendant, attributed reports that defendant was at the scene.   Thus the only substantive discrepancy in the trial testimony is that it attributed such a report to Alejandro Jaso, who may or may not be one of the persons to whom Investigator Rodriguez attributed such a report in the interview.   It is all but inconceivable that this slight inaccuracy in his testimony—if it was such—could have any effect on a jury's evaluation of the evidence.

It is even less tenable to posit this discrepancy as an instance of prosecutorial misconduct.   Nothing in the record indicates that the prosecutor was responsible for it.   All he did was ask the witness, with reference to "the murder," "[W]ho did you tell him you talked to?"   It was the witness who replied with the list of names associated in the interview transcript with the question whether defendant "lived there."   Nor is there any suggestion that the witness's seeming conflation of the two lists of witnesses was the product of anything other than innocent misrecollection or, to the extent the witness was referring to the transcript at the time of his testimony, innocent misconstruction.   In short, defendant's claim that the witness "misstated evidence" is accurate only in the sense that a trivial discrepancy exists between the witness's testimony and the transcript of his questioning of defendant.

Further, if defendant felt the prosecutor's questions misstated the evidence, it was open to him to object on that ground, challenge the witness's testimony on cross-examination, or both.   Those questions do not suggest prosecutorial misconduct on appeal.   And while we have addressed the misconduct claim largely under state law, our conclusion applies with even greater force to defendant's suggestion that the prosecutor's actions "'infect[ed] the trial with such unfairness as to make the conviction a denial of due process'" under the federal constitution.   (Citing *Wallace*, *supra*, 44 Cal. 4th at p. 1070.)   Our careful review of the entire record reveals nothing even arguably approaching that level of unfairness.

*Soto*, 2018 WL 2949484, at *19-22 (brackets in original).

### b.   Procedural Default

As an initial matter, this procedural misconduct claim is procedurally defaulted.   The state appellate court found that this claim was forfeited because defense counsel did not object to the alleged prosecutorial misconduct or request that the jury be admonished to disregard the perceived impropriety.   *Soto*, 2018 WL 2949484, at *19.

United States District Court
Northern District of California

A federal court will not review questions of federal law decided by a state court if the decision also rests on a state law ground that is independent of the federal question and adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred. *See id.* at 750. The rule cited here by the court of appeal, specifically, that a defendant must make a contemporaneous objection at trial in order to preserve an issue on appeal, has been found to be a sufficiently independent and adequate procedural rule to support the denial of a federal petition on grounds of procedural default. *See Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004) (finding claim procedurally defaulted based on failure to request clarification in jury instruction under California's contemporaneous objection rules).

The Court therefore cannot reach this claim.[8]

### c.    Analysis of State Court's Rejection of Claim on Merits

Although the state appellate court found that this procedural misconduct claim was procedurally waived, it also found that the claim failed on the merits. *Soto*, 2018 WL 2949484, at *20-22.  Based on a review of the record, and applying the legal principles on prosecutorial misconduct, as outlined below, to this claim, the Court finds that the state appellate court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent and was not based on an unreasonable determination of the facts in light of the entire trial record.  Thus, even if the claim were not waived, the Court would not grant relief.

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).  A prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine

---

[8] In cases in which a state prisoner has defaulted his federal claims in state court, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750. Petitioner here has not made such a showing.

1   whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting

2   conviction a denial of due process.'" *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995); *see*

3   *Trillo v. Biter*, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the

4   misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

5   Even if there was misconduct, a habeas petitioner is not entitled to relief unless the misconduct

6   "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507

7   U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  In other words, state

8   prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial

9   error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." *Id.*

10  (citation omitted).

11          Here, as a precaution, the defense moved to exclude the hearsay statements of non-

12  testifying witnesses who were at the scene of the crime and made photo identifications of

13  petitioner and gave inculpatory statements to the police regarding appellant's involvement in the

14  crime.  Both the prosecutor and defense counsel agreed that such statements would not be

15  admissible.  2 RT 43-44.  In fact, in an abundance of caution, the prosecutor indicated that he

16  would "admonish all officers not to mention Don Panchito's statement." 2 RT 44.  The trial court

17  ruled that nothing could come in "about those individuals who [were not] present, their photo

18  identification and statements." 2 RT 43.  The defense made clear the concern that officers would

19  be testifying relying on previous reports and that they might refer to "hearsay and multiple

20  hearsay" statements.  2 RT 43.  The prosecutor agreed but pointed out that there may be

21  statements with a nonhearsay purpose, namely, the "for its effect on the listener." 2 RT 44.  The

22  trial court agreed.  2 RT 44.

23          Petitioner argues the prosecutor violated the trial court's ruling in eliciting from

24  Investigator Rodriguez what he told petitioner, namely that others had identified petitioner at the

25  scene.  The state appellate court found that this testimony was not elicited for the truth of matter,

26  but for the effect it had on petitioner. *Soto*, 2018 WL 2949484, at *15.  Defense counsel explained

27  to the trial court, in response to its suggestion that he had "opened the door" to previously

28  inadmissible evidence:

United States District Court
Northern District of California

1

2

3

> [Defense Counsel:] Just to clarify your Honor, as far as me going back to that specific section, we had very early discussions having to do with issues, not just hearsay but Crawford issues as well, and they are very specific individuals that we had named out, and that no references could be made regarding the statements that were made.

4

5

6

> Regarding what was asked in that transcript, had to do with simply placing Mr. Soto at the particular scene, not any specific details about what was witnessed or otherwise, which is why I inquired about that just to make that clarification.

7

> [THE COURT:] Okay. That's fine.

8

> [THE PROSECUTOR:] I agree, your Honor.

9

5 RT 272-273.

10

    As defense counsel's comments make clear, the in limine ruling addressed itself to the

11

content of these non-testifying witnesses' statements to police.  Both parties recognized that

12

petitioner's response to Investigator Rodriguez telling him that others had identified at the scene,

13

namely that he was not there and that if people said that they were lying, was not hearsay and was

14

not covered by the court's ruling.  The state appellate court found, not unreasonably, that the

15

prosecutor did not violate the in limine order.  Thus, the state appellate court's determination that

16

no prosecutorial misconduct occurred was not so lacking in justification that it was beyond any

17

possibility of fairminded disagreement.  *See Richter*, 562 U.S. at 103.  Accordingly, this

18

prosecutorial misconduct claim is denied.

19

### 6.    Cumulative Error

20

    Finally, petitioner alleges that the prejudicial impact of the violation of his Fifth, Sixth and

21

Fourteenth Amendment rights during the custodial interview, when combined with the *Crawford*

22

error, require reversal under the federal due process clause.  EFC No. 1 at 7.  In some cases,

23

although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of

24

several errors may still prejudice a defendant so much that his conviction must be overturned.

25

*Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003).  Where there is no single constitutional

26

error existing, nothing can accumulate to the level of a constitutional violation.  *Hayes v. Ayers*,

27

632 F.3d 500, 524 (9th Cir. 2011).  Here, no single constitutional error has been found.

28

    Accordingly, petitioner is not entitled to habeas relief on this claim.

United States District Court
Northern District of California

## IV.   CERTIFICATE OF APPEALABILITY

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  *See* Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  *Id.* § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

### CONCLUSION

For the reasons stated above, the request for an evidentiary hearing is denied, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of respondent and close the file.

Additionally, the Clerk is directed to substitute Theresa Cisneros on the docket as the respondent in this action.

**IT IS SO ORDERED.**

Dated:  September 1, 2021



JON S. TIGAR
United States District Judge